# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| <u>In Re</u> | : | |
| | : | CASE NO.: 25-MC-96 (TSC) |
| ALL ASSETS HELD IN ACCOUNT | : | |
| JW3083094 IN THE NAME OF | : | |
| CARINALLI, S.A. AT JEFFRIES, LLC | : | |
| | : | |
| | : | |
| ALL ASSETS HELD IN ACCOUNT | : | July 17, 2025 |
| JW3125077 IN THE NAME OF | : | |
| CARINALLI, S.A. AT JEFFRIES, LLC | : | |
| | : | |

ALL ASSETS HELD IN ACCOUNT
JW3125341 IN THE NAME OF
COMPTOIR INTERNATIONAL CORP.
AT JEFFRIES, LLC

ALL ASSETS HELD IN ACCOUNT
JW3070000 IN THE NAME OF SARA
GOLDRING WAISBIOT AND DANIEL
CUKIER AT JEFFRIES, LLC

ALL ASSETS HELD IN ACCOUNT
JW3078888 IN THE NAME OF SARA
GOLDRING WAISBIOT AND DANIEL
CUKIER AT JEFFRIES, LLC

ALL ASSETS HELD IN ACCOUNT
JW3078904 IN THE NAME OF SARA
GOLDRING WAISBIOT AND MARTIN
CUKIER AT JEFFRIES, LLC

ALL ASSETS HELD IN ACCOUNT
JW3073491 IN THE NAME OF UNITED
MARITIME CAPITAL, LLC AT
JEFFRIES, LLC

ALL ASSETS HELD IN ACCOUNT 711-
891671 IN THE NAME OF DARIO
CUKIER GOLDRING AND SARA
GOLDRING WAISBIOT AT MORGAN
STANLEY

ALL ASSETS HELD IN ACCOUNT 711-891670 IN THE NAME OF SARA SILVIA CUKIER GOLDRING AND MARTIN CUKIER GOLDRING AT MORGAN STANLEY

ALL ASSETS HELD IN ACCOUNT 741-073746 IN THE NAME OF UNITED BROKERS S.A. AGENTE DE VALORES C/O M CUKIER GOLDRING, SS GOLDRING WAISBIOT, CM AT MORGAN STANLEY

ALL ASSETS HELD IN ACCOUNT 711-045184 IN THE NAME OF UNITED MARITIME CAPITAL, LLC AT MORGAN STANLEY

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 3

    A. Ms. Goldring, her sons, their Entities, and their Securities Accounts ......................... 3

    B. Ms. Goldring's Business Activities in Uruguay ....................................................... 3

    C. Accounts in the United States .................................................................................. 4

        1. UB and CVM Omnibus Accounts ......................................................................... 4

        2. Goldring Family Accounts ................................................................................... 6

    D. Market Losses in 2022 and Resulting Consequences ................................................ 7

    E. Legal Proceedings Against Ms. Goldring and her Business in Uruguay ..................... 9

    F. Uruguayan Efforts to Restrain Ms. Goldring's Accounts in the U.S. ....................... 12

        1. Jefferies Unlawfully and Indefinitely Freezes the Goldring Accounts .......... 12

        2. The DOJ Rejects the Uruguayan MLAT Request to Freeze the Accounts ..... 16

    G. Jefferies Acted as an Arm of the DOJ Since at Least January 21, 2025 ................... 18

    H. The S.D.N.Y. Lawsuit ........................................................................................... 19

ARGUMENT .................................................................................................................. 20

    A. The Government Cannot Establish Dual Forfeitability ............................................. 20

    B. The Government Cannot Establish "Dual Restrainability" ....................................... 22

    C. The Application is Akin to the Fruit of the Poisonous Tree, Specifically the
    Government's Violation of Ms. Goldring's 4th and 5th Amendment Rights ............... 25

        1. Jefferies Acted at the Direction of DOJ for at Least Five Months Before DOJ
        Filed the Application ....................................................................................... 26

            a. The Fourth Amendment Violation ....................................................... 27

            b. The Fifth Amendment Violation ......................................................... 29

c. Fruit of the Poisonous Tree ................................................................... 30

<u>CONCLUSION</u>................................................................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Haramain Found., Inc. v. U.S. Dep't of Treasury*,
    585 F.Supp. 2d 1233 (D.Ore. 2008), *aff'd in part, rev's in part,* 660 F.3d 1019
    (9th Cir. 2011), 686 F.3d 965 (9th Cir. 2012)......................................................................27

*Colello v. S.E.C.*,
    908 F. Supp. 738 (C.D. Cal. 1995) ......................................................................................27

*Gang Luan v. United States*,
    722 F.3d 388 (D.C. Cir. 2013) ......................................................................................22, 24

*Kaley v. United States*,
    571 U.S. 320 (2014)..............................................................................................................23

*KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*,
    647 F.Supp.2d 857 (N.D. Oh. 2009) ....................................................................................27

*Lopez Bello v. Smith*,
    651 F.Supp.3d 20 (D.D.C. 2022) .........................................................................................28

*NB v. District of Columbia*,
    794 F.3d 31 (D.C. Cir. 2015) ...............................................................................................26

*In re Seizure of Approx. $12,116,153.14*,
    903 F. Supp.2d 19 (D.D.C. 2012) ..................................................................................20, 30

*United States v. Cosme*,
    796 F.3d 226 (2d Cir. 2015)............................................................................................27, 28

*United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S.*
    *Currency*,
    461 U.S. 555 (1983)..............................................................................................................29

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993)................................................................................................................29

**Statutes**

28 U.S.C. § 2467.......................................................................................................20, 22, 26, 28, 29

**Other Authorities**

Fed. R. Crim. P. 32.2(b)(1)(A)................................................................................................23

## OPPOSITION TO APPLICATION

For the reasons stated below, respondents Sara Silvia Goldring Waisbiot ("Ms. Goldring"), Martin Cukier Goldring, Daniel Cukier Goldring, Carinalli Corp., Comptoir International Corp., and United Maritime Capital, LLC (collectively "Respondents"), respectfully oppose the government's Application to Restrain Assets (the "Application") (ECF #1).

## INTRODUCTION

For decades, Sara Goldring successfully operated securities brokerage firms in her home country of Uruguay, earning excellent returns for her clients and fees for herself that she successfully invested as well. But after securities markets took an unexpected turn in late 2021 and early 2022 that caused Ms. Goldring and her clients to lose money, she suffered a series of injustices:

- First, the American brokerage firm Jefferies, LLC ("Jefferies") froze her personal accounts there in the United States for more than two years at the request of the Uruguayan Central Bank ("UCB"), even though neither the UCB nor Uruguayan prosecutors followed the process for restraining accounts required by the Mutual Legal Assistance Treaty ("MLAT") between the United States and Uruguay, and even though the UCB itself made a legally binding admission that it had no authority to freeze accounts in the United States.

- Next, after investigating Ms. Goldring for various crimes, including money laundering and fraud, in December 2023 Uruguayan prosecutors charged her only with misappropriation, and they charged her with that offense using a strained and novel theory that doesn't even allege she removed any assets from client accounts.

- Then, after she reached an agreement in principle with the UCB to settle its administrative action against her by paying millions of dollars for the benefit of clients who had suffered losses, an agreement that has since been formalized and, if consummated, would likely lead to the termination of the criminal charge she faces, Uruguayan prosecutors sought to save their case by preventing her from consummating that agreement; they redoubled their previously unsuccessful efforts to have the United States government prevent her from accessing the very accounts at Jefferies that held assets she needs to consummate the agreement.

1

- In addition, after the UCB reached this agreement with Ms. Goldring and informed Jefferies that it no longer wanted her accounts there frozen, the United States Department of Justice ("DOJ") used Jefferies as its agent to keep the accounts frozen for about five months, without any judicial involvement or hearing, ignoring the relevant treaty and statutory scheme and violating Ms. Goldring's Fourth and Fifth Amendment rights.

- Last, when DOJ finally and belatedly sought to restrain Ms. Goldring's accounts in a lawful manner in June 2025, it did so by seeking to enforce a Uruguayan court order issued almost two and a half years earlier that is premised on crimes Ms. Goldring was never charged with, and which DOJ had repeatedly told Uruguayan authorities was insufficient to justify restraining her accounts in United States; DOJ had previously and correctly rejected those requests from Uruguay because Uruguayan authorities had provided no evidence whatsoever of any nexus between the charged crime and the assets in these accounts – and in fact, the very indictment Ms. Goldring faces in Uruguay alleges a theory that renders it impossible for the subject accounts to contain the proceeds of the charged crime.

While it is not for this Court to reverse or halt each and every one of these injustices, they all inform the basis for the relief Respondents seek in response to the Application. First, the government has not met its burden under the relevant statute to prove "dual forfeitability," as the American criminal laws the government cites are not in fact analogues of the crime Ms. Goldring is charged with in Uruguay. Second, the Application does not even attempt to prove "dual restrainability," as the D.C. Circuit has held the relevant statute requires, meaning that the Application doesn't even try to establish that the requirements for pre-conviction restraint of assets under U.S. law have been met – most importantly that the subject accounts contain the proceeds of a crime – which DOJ repeatedly told Uruguayan authorities was necessary when rejecting their MLAT request, before DOJ inexplicably reversed course a month ago. Third, the Court should not countenance the government's unconstitutional use of Jefferies as its undeclared agent to restrain Ms. Goldring's accounts for months, without any judicial involvement or hearing. For all of these reasons, and for the additional reasons set forth below, Respondents respectfully ask the Court to deny the Application.

## FACTUAL BACKGROUND

A. <u>Ms. Goldring, her Sons, their Entities, and their Securities Accounts</u>

Ms. Goldring is a citizen and resident of Uruguay who also holds a passport from her native Argentina.  *See* Declaration of Sara Goldring ("Goldring Dec.") attached hereto at ¶ 4. She is the sole owner of Carinalli International Corp ("Carinalli") and Comptoir International Corp. ("Comptoir"), which are both Panama corporations with their principal places of business in Uruguay.  *See* Goldring Dec. ¶ 6.  Ms. Goldring and her adult son Martin, who is a citizen of Uruguay and for whom Ms. Goldring holds power of attorney, are the sole beneficial owners of United Maritime Capital, LLC ("United Maritime"), a limited liability company organized under the laws of Delaware.  *See* Goldring Dec. ¶¶ 5, 7.  Daniel Cukier Goldring, another adult son of Ms. Goldring, is also a citizen of Uruguay for whom Ms. Goldring holds power of attorney.  *See* Goldring Dec. ¶ 5.[1]

B. <u>Ms. Goldring's Business Activities in Uruguay</u>

Ms. Goldring is an experienced securities investor, and from approximately 1995 through 2022 she operated Uruguayan brokerage businesses named United Brokers, S.A. ("UB") and Custodia de Valores Mobiliarios, S.A. ("CVM") (together, "the Brokerages") through which she made investments in American securities on behalf of clients.[2]  *See* Goldring Dec. ¶ 14.  The Brokerages were both registered with and regulated by the Uruguayan Central Bank ("UCB"),

---

[1] Dario Cukier Goldring, who is a joint owner with Ms. Goldring of an account at Morgan Stanley that is the subject of the Application, is also an adult son of Ms. Goldring.  The undersigned counsel do not represent Dario Cukier Goldring in connection with the Application.

[2] Ms. Goldring owned 66% of UB, and her son Martin owned 34%.  Ms. Goldring owned 57% of CVM, her son Martin owned 40%, and her son Daniel owned 3%.  However, as will be described further below, both UB and CVM were placed into receivership by Uruguayan authorities in 2022, and neither Ms. Goldring nor her sons have had any influence on, let alone control of, the Brokerages' operations since then.  *See* Goldring Dec. ¶ 17

which is an agency of the Uruguayan government and the primary regulator of the Uruguayan financial sector, including securities brokers, and overseer of Uruguayan capital markets. *See id.*

All of the investments Ms. Goldring made on behalf of the Brokerages' clients were in accordance with the agreed-upon investment plans and risk tolerances set forth in investment contracts that each client signed with the Brokerages. *See* Goldring Dec. ¶ 15. Some of the investments Ms. Goldring made, both (a) with her own and her family's funds and (b) on behalf of her clients using funds in their accounts, were highly risky and speculative, including put options and similar derivative products that could result in negative balances that the investor would have to cover. *See* Goldring Dec. ¶ 14. For clients who opted for a high-risk investment strategy, their investment contracts all included fulsome disclosures about put options and the inherent risks of investing in put options or similar derivatives. *See* Goldring Dec. ¶ 15. Ms. Goldring never invested in put options or similarly risky investment vehicles with the funds of clients whose investment contracts called for a moderate or conservative investment strategy, but rather, only for those who knowingly agreed to, and signed up for, an aggressive investment strategy. *See id.*

C.  Accounts in the United States

1.  UB and CVM Omnibus Accounts

It was and is a legal and standard practice, consistently used and broadly recognized in the Uruguayan financial industry, for Uruguayan brokerage and investment companies that provide the Uruguayan public with the opportunity to trade American securities on American exchanges to maintain an "Omnibus Account" at an American securities firm. *See* Goldring Dec. ¶ 18. In the case of UB and CVM, in 2021 and 2022 their Omnibus Accounts were held at

Jefferies.[3]  *See id.*  Such an Omnibus Account holds all the Uruguayan brokerage firm's customers' U.S. securities investments.  *See id.*  Thus, for example, while a Uruguayan brokerage firm may have 100 different Uruguayan clients, each of whom has an account with that brokerage firm, the firm deposits all of the invested assets of each of the 100 firm clients in the firm's single Omnibus Account at a U.S. financial institution like Jefferies.  The Uruguayan firm is responsible for allocating portions of trades executed within its Omnibus Account among the firm's various clients.  For this purpose, the Uruguayan firm maintains its own records of its individual clients' assets, even as those assets are all commingled in the firm's single Omnibus Account.  *See id.*

Omnibus Accounts such as those the Brokerages held at Jefferies enable customers to purchase U.S. securities even if they can't otherwise afford to make an investment large enough to meet the minimum balance thresholds of a U.S. securities firm.  *See* Goldring Dec. ¶ 19. Omnibus Accounts also significantly reduce administrative fees that Uruguayan brokerage firms like UB and CVM have to pay to U.S. securities firms, savings that the Brokerages passed on to their clients.  *See id.*

But while Omnibus Accounts offer these benefits to Uruguayan securities brokers and their clients, they also create a risk that losses suffered in an Omnibus Account that are attributable to one individual firm client or group of clients, including losses on risky put option or other derivative vehicles that result in a negative balance that must be covered by the Omnibus Account as a whole, can outstrip the value of those clients' assets within the Omnibus Account. *See* Goldring Dec. ¶ 20.  Negative balances due to such put option investments can also cause the

---

[3] The Application repeatedly misspells the name of this institution as "Jeffries," both in the caption and the body of the Application.  The correct spelling is "Jefferies."

financial institution where those investments are held to force the liquidation of other assets in the same Omnibus Account to cover those losses. *See id.* The Uruguayan brokerage firm must then internally allocate these losses to all of its clients, which can result in clients whose own assigned investments did not suffer losses to nevertheless suffer losses in their own individual accounts maintained by the Uruguayan broker. *See id.*

For these reasons, the UCB formally and strictly regulates Uruguayan brokers' Omnibus Accounts, mandating adherence to a rigorous reporting framework established by the Uruguayan Securities Market Law and regulations issued by the UCB, including monthly disclosure of Omnibus Account statements, or more frequent disclosure if directed. *See* Goldring Dec. ¶ 21. At Ms. Goldring's instruction, UB and CVM always complied with all of the UCB's regulatory requirements and directives, and in 2021 the UCB gave both CVM and UB clean bills of health after subjecting them to a rigorous periodic audit. *See id.* Therefore, the allegations in the Application that Ms. Goldring "allegedly used other clients' assets as collateral or mixed other clients' assets into combined accounts in order to diminish or conceal losses to the losing portfolios" betray, at best, a failure to understand standard, permitted, regulated practices in the Uruguayan securities brokerage industry, and at worst a willful disregard of those permitted practices.

2. Goldring Family Accounts

Ms. Goldring and members of her family made investments through accounts they held at CVM and UB, which were in turn invested through the Brokerages' Omnibus Accounts at Jefferies, like the investments of all other CVM and UB clients. *See* Goldring Dec. ¶ 22. Ms. Goldring also made investments on behalf of herself and members of her family using separate securities accounts at Jefferies and Morgan Stanley that contained only her and her family's own

funds.  *See id.*  These "Goldring family" funds were all derived from profits she had earned

charging standard fees to Brokerage customers over the course of decades, savings derived from

fees earned by her now-retired husband through decades of work as an accountant, and decades'

worth of profits on those investments, as well as other funds derived completely independently

of the Brokerages.  *See id.*  During at least the relevant period since June of 2021, no assets with

a positive value were ever transferred, directly or indirectly, from the Omnibus Accounts to any

account held by the Goldring family.[4]  *See id.*  The accounts at Jefferies that contained only

"Goldring family" funds (the "Goldring Accounts") were held in the name of Carinalli

(Accounts # JW3083094 and JW3125077, the first two accounts listed in the caption of the

Application), Comptoir (Account #JW3125077, the third account listed in the caption of the

Application), United Maritime (Account # JW3073491, the seventh account listed in the caption

of the Application), and jointly in the names of Ms. Goldring and her son Martin (Account #

JW3078904, the sixth account listed in the caption of the Application).[5]  *See id.*

D.  <u>Market Losses in 2022 and Resulting Consequences</u>

Ms. Goldring's put option investment strategies were successful for many years. *See*

Goldring Dec. ¶ 23.  In or about late 2021 and the beginning of 2022, however, market

---

[4] Assets with a *negative* value were at one point transferred from the Omnibus Accounts to one of the Goldring Accounts, as described more detail below.

[5] The Application also seeks to restrain two accounts at Jefferies held jointly in the names of Ms. Goldring and her son Daniel (the fourth and fifth accounts listed in the caption of the Application), but these accounts both have balances of zero – all of the assets in these accounts were transferred to accounts at CVM in 2022, which were thereafter taken over by a receiver the CBU appointed to take over CVM.  The Application also seeks to restrain four accounts at Morgan Stanley – one held jointly by Ms. Goldring and her adult son Dario; one held jointly by Ms. Goldring and her adult son Martin; one held in the name of UB; and one held in the name of United Maritime.  The Morgan Stanley account held in the name of UB is controlled by an appointed receiver, not any of the Respondents.  Respondents take no position with respect to the other three accounts at Morgan Stanley.

conditions unexpectedly turned and caused significant investment losses in Ms. Goldring's put option investments, both in her and her family's own accounts (meaning their accounts at the Brokerages, as well as the Goldring Accounts at Jefferies) and in the accounts of the Brokerages' clients who had selected high-risk investment strategies. *See id.* Without seeking Ms. Goldring's consent, Jefferies then exercised its right to liquidate some of the put option positions in the Brokerages' Omnibus Accounts with negative values and used the assets allocated to other clients that were in the Omnibus Accounts to cover those losses, including clients who had not made risky put option investments. *See id.* The magnitude of the losses in the CVM and UB Omnibus Accounts led to significant reductions in the cash and securities allocated to each of the Brokerages' customers. *See id.*

Consistent with Uruguayan law, the Brokerages' regulator, the UCB, was always kept properly informed of the financial condition of the Brokerages. *See* Goldring Dec. ¶ 24. Once the threat to the soundness of the Brokerages from put option losses became apparent in or about January of 2022, Ms. Goldring neither sought nor accepted any new clients for the Brokerages, nor, to the best of her recollection, did she accept any new deposits from existing clients.[6] *See id.* Nor did Ms. Goldring ever divert money from one brokerage client's "account" to another Brokerage client's "account" – in fact, she could not have done so even if she wanted to, because all of the Brokerage clients' assets were held (as approved by the CBU) in a single Omnibus Account. *See id.*

Nevertheless, in an effort both make the Brokerages' clients whole and preserve the viability of the Brokerages as going concerns, Ms. Goldring voluntarily infused the Brokerages' Omnibus Accounts with approximately $25 million *of her own funds* – a fact verified by

---

[6] Ms. Goldring opened the last new Brokerage client in June 2021. *See* Goldring Dec. ¶ 24.

Uruguayan prosecutors in the very indictment that ultimately issued against her in Uruguay, as well as by the CBU in report it issued – by doing the following: transferring over $17.5 million in put option *losses* from the Brokerages' Omnibus Accounts to one of her Carinalli accounts, thereby assuming those losses for herself; purchasing assets held by clients in the Brokerages' Omnibus Accounts for more than $200,000 above their market value; and transferring more than $7.8 million worth of assets from her own accounts into the Brokerages' Omnibus Accounts. *See* Goldring Dec. ¶ 25.

    E.  <u>Legal Proceedings Against Ms. Goldring and her Business in Uruguay</u>

        Unfortunately, the losses suffered in the Brokerages' Omnibus Accounts by Ms. Goldring, her family members, and her clients who had selected the aggressive, risky put option strategy were sufficiently large that despite the infusion of $25 million of Ms. Goldring's own funds, in the summer of 2022 the CBU exercised its regulatory authority to terminate Ms. Goldring's control of the Brokerages and appoint a receiver to operate them (the "Receiver"). *See* Goldring Dec. ¶ 26.  At the time the CBU appointed the Receiver, the Brokerages' clients were owed about $20.639 million more than the value of the Brokerages' assets.  *See id.*  The Receiver did not try to close out and sell open positions in vehicles like put options that were held in client accounts within the Omnibus Accounts, which temporarily increased the size of those losses.  *See id.*  But because of changes in market conditions since 2022 this figure shrank again; while this loss figure – meaning the difference between the book value of the Brokerage clients' assets in the Omnibus Account and the actual amount of assets available to satisfy the Brokerages' obligations to those clients – is difficult to calculate today, it is nowhere near the

$100 million figure that the Application alleges (and for which the Application cites no support).[7]  *See id.*

All of the losses suffered by the Brokerages' clients who had selected an aggressive investment strategy were a foreseeable potential outcome of the risky strategy that those clients had knowingly selected.  Unfortunately, some of the losses were suffered by investors who had not selected a high-risk strategy.  This occurred because Jefferies had unilaterally sold some of those clients' assets in order to cover negative balances created by losses suffered by other clients' high-risk investments in the Omnibus Accounts, leading to proportional reductions in the balances of all firm client accounts.

Thereafter, some of the Brokerages' clients filed complaints against Ms. Goldring with Uruguayan authorities, who began administrative and criminal investigations.  In December 2022, Uruguayan prosecutors obtained an order from a Uruguayan court (the "December 12, 2022 Order") purporting to freeze a number of accounts in the United States associated with Ms. Goldring, including the Goldring Accounts.  *See* Exhibit A to the attached Declaration of Paul Tuchmann (the "Tuchmann Dec.").  The December 12, 2022 Order did not state that any of these accounts contained the proceeds of any crimes.[8]

On December 20, 2023, Ms. Goldring was criminally charged in Uruguay with the offense of misappropriation in the Uruguayan equivalent of an indictment (the "Indictment") (attached hereto in the original Spanish as Exhibit A to the Goldring Dec. and attached hereto

---

[7] Also, more than 15% of the uncovered losses suffered by Brokerage accountholders due to the collapse of CVM and UB were suffered by Ms. Goldring and members of her family, who had invested and held significant sums in accounts at the Brokerages that were in turn held in the Brokerages' Omnibus Accounts.  *See* Goldring Dec. ¶ 30.

[8] Later, Uruguayan prosecutors asked, and the Uruguayan court agreed, to remove from the scope of the December 12, 2022 Order some of the accounts that were originally subject to it.

with relevant portions translated into English as Exhibit B to the Tuchmann Dec., with a translator's certification attached to the Tuchmann Dec. as Exhibit B1). Oddly, while Ms. Goldring is charged with misappropriation (and only that offense), the Indictment does not even allege that she took money from one account and improperly placed it another account, let alone another account belonging to Ms. Goldring or her family, such as the accounts at issue in the Application. Instead, the Indictment attempts to hold her criminally responsible for Jefferies' unilateral decision to liquidate the assets of the Brokerages' lower-risk clients in the Omnibus Accounts to cover the losses of the high-risk clients in those Omnibus accounts, all of which was properly and timely disclosed to the Brokerages' regulator the CBU, during a period when Ms. Goldring was not accepting new clients or additional deposits – because Ms. Goldring allegedly did not disclose this risk to the low-risk clients. As the Indictment states:

> Indeed, in her capacity as President [of the Brokerages,] the accused appropriated assets entrusted to her by many clients, turning them into the benefit of a third party [meaning other of her clients] despite her obligation to return these assets or make specific use of them.

> And the foregoing is so by virtue of the fact that the securities of a large number of clients that were entrusted to her to hold in custody and invest in a reasonable manner, were used by her, without giving prior notice, to pay or settle the losses suffered by other clients, for the high-risk investments that she made.

Tuchmann Dec. Ex. B at 16.

To be clear, notwithstanding these allegations, it was Jefferies that made the unilateral decision (as it presumably had the right to do under its contracts with the Brokerages) to liquidate the alleged victim clients' assets and use them to cover other clients' investment losses, not Ms. Goldring. But regardless of the Uruguayan prosecutor's novel theory of misappropriation, which appears much more like a regulatory violation than a crime, the

Uruguayan criminal proceeding is ongoing, and under Uruguayan law Ms. Goldring is presumed, and thus remains, innocent of that charge. Ms. Goldring has never been charged with any other offense, including money laundering or fraud, notwithstanding the references to those offenses in the letter rogatory Uruguayan authorities issued in connection with the December 12, 2022 Order, a year before Ms. Goldring was ultimately charged.[9]

F.    Uruguayan Efforts to Restrain Ms. Goldring's Accounts in the U.S.

1.    Jefferies Unlawfully and Indefinitely Freezes the Goldring Accounts

On or about August 15, 2022, the CBU sent Jefferies a one-page letter (attached hereto as Exhibit B1 to the attached declaration of Juan Mailhos Gallo ("Mailhos Dec."). This letter referenced entitlement orders Ms. Goldring had asked Jefferies to perform, namely, instructions she gave Jefferies to make cash transfers involving certain of the Goldring Accounts. The CBU's August 15, 2022 letter to Jefferies also referenced lawsuits the letter said had been initiated against Ms. Goldring in Uruguay and posited that the plaintiffs in those lawsuits may have a claim on assets in the Goldring Accounts. The CBU concluded the letter by stating that since it "cannot ascertain whether the funds and securities" in Ms. Goldring's and her family's accounts at Jefferies actually belonged to those accounts' owners, "we kindly ask you not to proceed with disbursements" from her accounts.

The CBU, a Uruguayan government agency, did not and does not have jurisdiction over Jefferies, which has no offices in Uruguay, or over Jefferies securities accounts located in the United States. Further, as Jefferies well knew, contrary to the statement in the CBU's August 15, 2022 letter, the assets in the Goldring Accounts belonged to Ms. Goldring and her family, as

---

[9] The assertion in the Application that Ms. Goldring has been charged with fraud is incorrect. *See, e.g.,* Application at 2. Notably, the Application is not supported by any affidavit.

Jefferies had records showing from where those assets flowed into the Goldring Accounts. Nevertheless, Jefferies complied with the CBU's request and promptly froze all accounts at Jefferies affiliated with Ms. Goldring, including the Goldring Accounts, even though no court or regulator with jurisdiction over Jefferies or the Goldring Accounts, (i.e., an American court or an American regulator such as the Securities and Exchange Commission ("SEC")) had ordered Jefferies to do so.

On or about September 30, 2022, Ms. Goldring's Uruguayan counsel sent a letter to Jefferies (attached hereto as Exhibit A1 to the Mailhos Dec.) that, among other things, accurately informed Jefferies that under Uruguayan law, the CBU did not have the legal capacity to give any instruction to Jefferies regarding the Goldring Accounts. Yet Jefferies continued to freeze the Goldring Accounts, even though there was no order, let alone a valid order, directing it to do so.

On or about October 4, 2022, Jefferies sent an email in response to Ms. Goldring's Uruguayan counsel (attached hereto as Exhibit B to the Mailhos Dec.), forwarding him a copy of the CBU's August 15, 2022 letter to Jefferies and confirming that "Ms. Goldring's accounts are temporarily frozen because the Central Bank of Uruguay requested that Jefferies not allow any disbursements to be made from the accounts."

On or about November 7, 2022, Ms. Goldring's Uruguayan counsel sent Jefferies a letter (attached hereto as Exhibit C1 to the Mailhos Dec.) informing it that on November 1, 2022, the CBU had made representations to a Uruguayan court in response to a legal complaint filed there by Ms. Goldring against the CBU. As Uruguayan counsel informed Jefferies, these representations included that (as translated by Uruguayan counsel into English from the original Spanish) the CBU "has no legal capacity to determine the freezing of bank accounts based

13

[outside of Uruguay]." The November 7, 2022 letter attached an original Spanish version of that Uruguayan CBU court filing, which is attached in relevant part hereto as Exhibit D to the Mailhos Dec.

As demonstrated by a certified English translation from Spanish of the relevant part of this CBU legal filing (attached hereto as Exhibits C (translation) and C1 (certification) to the Tuchmann Dec.), the CBU elaborated on this position at length in its submission to the Uruguayan court, stating that Ms. Goldring's dispute with Jefferies was:

> a contractual issue between the actors and [Jefferies], which must be elucidated by the rules and jurisdiction of [the United States]. If Ms. Goldring or any of the plaintiffs understands that they are breaching a contract in the United States of America, they must resort to their judges and their legislation to achieve the protection they intend.
>
> The Central Bank of Uruguay did not and cannot issue any particular instruction regarding an entity acting outside its jurisdiction. Therefore, it is the absolute responsibility and competence of [Jefferies] to determine the course of action to be followed with the funds entrusted to it by its client.

Tuchmann Dec. Ex. C at 7.

Later in this Uruguayan court filing, the CBU repeated that its August 15, 2022 communication to Jefferies constituted only a request, and not an order:

> It is enough to read the note of August 15, 2022, addressed by the Superintendent of Financial Services [of the CBU] to Jefferies LLC to warn without hesitation that no instruction is addressed to said entity, but rather that - in response to its request - a situation is informed and a request is made - politely - a request that does not constitute - as is natural - any order or instruction. It is reiterated: this Central Bank does not inform any action to Jefferies LLC, does not issue any administrative act nor does it order any interdiction. Consulted by Jefferies LLC itself, certain facts were informed (actual, verified) and - in line with them - it was requested not to rush to release funds from Ms. Goldring or from companies under her ownership or control.

14

Tuchmann Dec. Ex. C at 8.

As the CBU stated through counsel in the conclusion section of its submission:

1- This alleged violation is related to a contractual relationship it maintains with a North American Bank, which must be settled in accordance with the legislation and before the jurisdiction of that country.

2- There is not and there cannot be any specific instruction addressed to a foreign Bank, even if it is shared by the plaintiff in the claim, since my client's territorial competence is limited within the scope of the Oriental Republic of Uruguay.

3- There was therefore no injunctive relief provided by our Institution in relation to assets of third parties located abroad. It should be noted that in no way would the Bank in the United States consider such a measure binding and that it will act in accordance with its legal system and the regulation that is applicable to it so indicates.

4- The [CBU], within the scope of its powers, informed Jefferies (at its request) of situations related to linked and correlated accounts with… the intervened companies, and it conducts a request that is not mandatory compliance by the foreign Bank as it is not supervised by my client and therefore cannot receive particular instructions from us with which it must comply. That Bank is subject to the legislation of its country and acts in accordance with it. …

7. The [CBU] has no competence to arrange for the blocking of accounts abroad and nor does it have the competence to provide the contrary, so it may make any type of non-mandatory request to the foreign bank, which has total independence to resolve what it deems appropriate based on its evaluation and the legal system of its country.

Tuchmann Dec. Ex. C at 12-13.

Nevertheless, despite being informed that the CBU itself had affirmed that the CBU's

August 15, 2022 letter did not constitute an order authorizing, let alone requiring, Jefferies to

freeze the Goldring Accounts, Jefferies' purportedly "temporary" freeze of the Goldring

Accounts continued *for more than two years*.

2.   The DOJ Rejects the Uruguayan MLAT Request to Freeze the Accounts

The only proper method for any Uruguayan government agency to cause a securities

account in the United States to be frozen or otherwise restrained is by following the procedures

set forth in the Mutual Legal Assistance Treaty ("MLAT") between the United States and

Uruguay (attached hereto, in relevant part as set forth in English, as Exhibit D to the Tuchmann

Dec.).  This treaty includes the specifically applicable Article 22, relating to the "Immobilization,

Forfeiture, and Transfer of Assets."  Through the process set forth in this treaty, Uruguayan

authorities may make a request to the United States Department of Justice Office of International

Affairs ("DOJ OIA") for DOJ to seek a United States court order freezing accounts in the United

States, such as the Goldring Accounts.

In or about late 2022 or early 2023, Uruguayan officials sought to use the December 2022

Order to restrain the Goldring Accounts through that very MLAT process, as demonstrated by an

email exchange involving Uruguayan prosecutors and DOJ (attached hereto as Exhibit E to the

Mailhos Dec.).  But on or about March 28, 2023, DOJ rejected the Uruguayan officials' efforts to

freeze the Goldring Accounts, because they had provided insufficient information.  As DOJ

explained to Uruguayan authorities:

> Typically, to restrain assets located in the United States, those
> assets must represent proceeds of an offense or property involved
> in or traceable to the commission of such offense.  The nature of
> the specified illicit activity from which the funds involved in the
> transactions are derived and the nexus between the offenses under
> investigation and the assets sought are both unclear from the facts
> presented in the request.  Establishing this connection will also
> require a more detailed explanation of the specific underlying
> criminal acts to which the assets are traceable.  For example, the
> requests cite the criminal offenses of fraud and money laundering;

16

> it is unclear from the facts in the requests what the fraudulent
> conduct was, how the proceeds of that criminal conduct were
> laundered, and what the connection is between the bank account
> identified in the request and the criminal conduct.

Mailhos Dec. Exhibit E at 1.

Uruguayan authorities sent DOJ a further submission on or about October 19, 2023, but this submission did not provide any evidence that the subject accounts at Jefferies contained the proceeds of any crime. *See* Exhibit H to the Mailhos Dec. While Respondents do not have visibility into all communications between Uruguayan authorities and the United States government about Ms. Goldring and the Goldring Accounts, Respondents are not aware of any communication from Uruguayan authorities to DOJ that even purported to provide the information DOJ requested, let alone actually did so; and until DOJ filed the Application on June 7, 2025, DOJ never sought a court order that would freeze the Goldring Accounts. Nevertheless, Jefferies' purportedly "temporary" freeze of the Goldring Accounts continued indefinitely for more than two years, as if DOJ had given the necessary approval to the MLAT request and obtained an order freezing the Goldring Accounts from an American court that had jurisdiction over Jefferies and the Goldring Accounts, when in fact it had not.

Further, even though (a) Jefferies had been notified as early as November 2022 that the CBU itself made a legally binding concession that it did not and does not have the authority to freeze accounts outside of Uruguay, and (b) the CBU's August 15, 2022 letter merely "requested" that, to the extent permitted by American law, Jefferies freeze accounts associated with Ms. Goldring, in a January 18, 2024 email (attached hereto as Exhibit E to the Tuchmann Dec.) Jefferies' outside counsel still referred to the CBU's August 15, 2022 letter as a "Uruguayan Central Bank freeze order" and stated that Jefferies would not unfreeze the accounts

that the CBU had requested be frozen in its August 15, 2022 letter "until the Uruguayan Central Bank authorizes us to do so."

G.  Jefferies Acted as an Arm of the DOJ Since at Least January 21, 2025

In a January 21, 2025 email (attached hereto as Exhibit F to the Tuchmann Dec.), outside counsel for Jefferies informed Ms. Goldring's American counsel that while Jefferies was now otherwise ready to unfreeze the Goldring Accounts, it was "waiting for clearance from DOJ and the SEC" to do so, and Jefferies could not do anything to "expedite things."  This representation meant that both (a) contrary to Jefferies' representation in the January 18, 2024 email (Tuchmann Dec. Ex. E), even with the consent of the CBU, which Jefferies had apparently now obtained, Jefferies would not unfreeze the Goldring Accounts without first getting approval from the SEC and/or DOJ; and (b) since at least January 21, 2025 (and presumably earlier, with the exact date to be determined by discovery in this case if necessary) Jefferies continued to freeze the Goldring Accounts not at the request of the CBU but of the United States government.

Around this time in January 2025, as shown by an email exchange (attached hereto as Exhibit F to the Mailhos Dec., with a certified translation into English and the certification attached as Exhibits G and G1 to the Tuchmann Dec., respectively), Uruguayan authorities were considering renewing their efforts to freeze the Goldring Accounts through the MLAT process. On February 10, 2025, DOJ responded to the Uruguayan authorities that U.S. law does not allow assistance for "restraint orders related to restitution/compensation" of victims, only for criminal forfeiture."  (attached hereto as Exhibit G to the Mailhos Dec., with an English translation and certification attached as Exhibit H and H1, respectively, to the Tuchmann Dec.) At a May 30, 2025 telephone conference in a lawsuit Ms. Goldring has filed against Jefferies in the Southern District of New York, in which Judge Rakoff had invited to DOJ to participate, DOJ represented

to Judge Rakoff that it was still contemplating whether to seek to restrain the Goldring Accounts

pursuant to the MLAT, and that it would make a decision within no more than a week. *See*

Tuchmann Dec. ¶ 16. Ultimately, on or about June 7, 2025, DOJ submitted the Application to

this Court.

H. The S.D.N.Y. Lawsuit

On April 30, 2025, Ms. Goldring filed a complaint (attached hereto as Exhibit I to the

Tuchmann Dec., without attachments) in the Southern District of New York against Jefferies

alleging that Jefferies' freezing of the Goldring Accounts constituted a violation of the Uniform

Commercial Code and a breach of the covenant of good faith and fair dealing. In that lawsuit

Ms. Goldring sought both damages and a preliminary injunction requiring Jefferies to unfreeze

the Goldring Accounts. After the government filed the Application in this Court, counsel for Ms.

Goldring represented to Judge Rakoff that she would consent to a stay of her motion for a

preliminary injunction pending this Court's resolution of the Application. *See* Tuchmann Dec.

¶ 15.

Ms. Goldring has reached an agreement (the "Agreement") with the CBU and the

Brokerages' CBU-appointed receiver to resolve all of their and the Brokerages' creditors (the

"Creditors") civil and administrative claims against her and the Brokerages, subject to the

approval of 75% of the Creditors. *See* Goldring Dec. ¶ 28. Resolving all these claims would

cause the Creditors to drop their civil and criminal complaints against her and lead to the likely

dismissal of the pending criminal charge Ms. Goldring faces. *See id.*

The terms of the Agreement include Ms. Goldring making a cash payment of millions of dollars that would be distributed to the Brokerages' creditors.[10]  *See* Goldring Dec. ¶ 29.  Ms. Goldring would fund this payment, in part, with assets worth millions of dollars in Uruguay that Ms. Goldring has title to.  *See id.*  However, because the total value of her liquid assets outside the Goldring Accounts is less than the total amount she must pay under the terms of the Agreement, Ms. Goldring will not be able to satisfy her obligations under the Agreement unless she is able to access a significant portion of the assets held in the Goldring Accounts, which she would then use for that purpose.  *See id.*

## **ARGUMENT**

### A.  The Government Cannot Establish Dual Forfeitability

As the government concedes in the Application, D.C. Circuit precedent requires that for the government to restrain assets under 28 U.S.C. § 2467(d)(3), it must prove "dual forfeitability," meaning that the offense Ms. Goldring is charged with in Uruguay qualifies for forfeiture under both Uruguayan and federal law.  *See* Application at 16-17, citing *Gang Luan v. United States*, 722 F.3d 388, 392 (D.C. Cir. 2013) and *In re Seizure of Approx. $12,116,153.14*, 903 F. Supp.2d 19, 30 (D.D.C. 2012).  But while the Uruguayan analogues of two of the qualifying American offenses that the government cites in the Application (wire fraud and securities fraud) may have been predicates for the investigation of Ms. Goldring that was ongoing two and a half years ago when the Uruguayan court issued the December 12, 2022 Order, Ms. Goldring has never been charged with any crime akin to wire or securities fraud.  Ms.

---

[10] While, as noted above, Ms. Goldring and her family sustained more than 15% of the uncompensated losses incurred by UB and CVM accountholders, they are not seeking to recover any monies from the Receiver as creditors of the Brokerages and are willing to absorb those losses for the benefit of the other creditors.  *See* Goldring Dec. ¶ 30.

Goldring has only been charged with misappropriation, and never with fraud of any kind. Thus, *ipso facto*, even should she ultimately be convicted of the charge she faces in the Indictment, there will be no judgment against her for a Uruguayan analogue to wire fraud or securities fraud, so the government will not be able rely on those analogue offenses to establish dual forfeitability. It would be both nonsensical and profoundly unjust to allow Ms. Goldring's assets in the United States to be frozen pending the conclusion of a criminal trial that cannot result in a forfeiture judgment that may be enforced here, because of a pretrial foreign restraining order premised on an investigation of offenses that were never charged.

The government also cites as an American analogue crime Interstate Transportation of Stolen Property, because Ms. Goldring's "alleged fraudulent activity appears to have involved her use of investment accounts outside of Uruguay (in the United States)," so her alleged crime supposedly involved "the international transfer of property stolen or taken by fraud across a national border..." Application at 22-23. As an initial matter, Ms. Goldring was not charged with engaging in "fraudulent activity," only misappropriation, as demonstrated by the Indictment. *See* Tuchmann Dec. Ex. B at 16. Further, there isn't even an *allegation* in the Indictment that any of the assets Ms. Goldring purportedly misappropriated (i.e., property allegedly stolen in violation of a Uruguayan statute analogous to an American Interstate Transportation of Stolen Property charge) ever crossed international (or state) borders after the alleged misappropriation. As set forth in Ex. B to the Tuchmann Dec., the charge of misappropriation Ms. Goldring faces is premised on allegations that assets belonging to certain clients within the Brokerages' Omnibus Accounts at Jefferies *in the United States* were liquidated by Jefferies, to make up for losses in those same Omnibus Accounts suffered by other

of the Brokerages' clients, without adequate disclosure by Ms. Goldring to the low-risk clients that their assets were at risk of being used this way.

Even assuming both (a) the truth of the allegations in the Indictment and (b) that if true such "nondisclosure" can meet the legal definition of misappropriation in Uruguay, nowhere does the Indictment allege that any property was moved from one state or country to another after it was misappropriated, let alone that Ms. Goldring knew of, let alone contributed to, the interstate or international movement of any misappropriated property. Even as charged, Ms. Goldring invested Brokerage clients' assets in Omnibus Accounts at Jefferies in the United States, and she did not move those assets anywhere else. Thus, the offense of Interstate Transportation of Stolen Property is not a valid basis for dual forfeitability in this case, either, and the government has failed to establish dual forfeitability. This failure, by itself, is a basis to deny the government's Application.

B.  The Government Cannot Establish "Dual Restrainability"

While the government at least attempts to establish "dual forfeitability," if unsuccessfully, the government utterly ignores its further obligation to establish "dual restrainability." In *Luan*, the D.C. Circuit held that to enforce a foreign court's restraining order pursuant to 28 U.S.C. § 2467(d)(3), the government must prove that "the property to be restrained represents the *suspected proceeds*" of a foreign criminal offense that has an American analogue that permits forfeiture. *Luan*, 722 F.3d at 392 (emphasis added). In other words, the D.C. Circuit has held that to obtain a restraining order under 28 U.S.C. § 2467(d)(3) it is not enough for the government to establish that the property to be restrained is *owned by* or otherwise *connected to* a person suspected of or charged with committing a dually forfeitable offense; the government must also present evidence that the assets it seeks to restrain pursuant to

the foreign court order are *traceable proceeds* of that offense. While other countries may have forfeiture regimes that permit their governments to restrain assets that belong to a person charged with, or even merely suspected of, a crime, regardless of whether or not those assets have any connection to that crime, the United States holds the presumption of innocence in greater regard.

In setting forth this requirement in *Luan*, the D.C. Circuit simply and appropriately applied the important principle of federal forfeiture law that before a defendant is convicted, the government may only restrain assets it can demonstrate have a nexus to the alleged or suspected offenses. *See Kaley v. United States*, 571 U.S. 320, 323-24 (2014) (finding that the "requirements for forfeiture under federal law" include probable cause "that the property at issue has the requisite connection to [the charged] crime"). Even after a person is convicted of a crime, this requirement typically still stands. S*ee* Fed. R. Crim. P. 32.2(b)(1)(A) ("[i]f the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense").

DOJ itself agrees: for years, it cited this very requirement – proving that the subject accounts contain the proceeds of a crime – to Uruguayan authorities when it insisted that before it could seek to enforce the December 12, 2022 Order and restrain these accounts, Uruguayan prosecutors had to provide evidence that the subject accounts contained proceeds of the offenses being investigated. *See* Mailhos Dec. Ex. E at 1. For as DOJ itself recognized, the December 12, 2022 Order contained no such evidence and instead is premised on preserving Ms. Goldring's assets to satisfy any obligations she might have to her former clients. *See* Tuchmann Dec. Ex. A at pp. 10-12. While Uruguayan prosecutors sent further information to DOJ following its rejection of their request, their submission did not include any evidence that the subject accounts contained any criminal proceeds, either (*see* Mailhos Dec. Ex. H). Unsurprisingly DOJ

continued to decline to seek an order from a U.S. Court that these accounts be restrained. Two years later, this requirement similarly caused DOJ to ask the Uruguayan prosecutors for evidence that the December 12, 2022 Order related to forfeiting the proceeds of a crime, rather than compensating victims. *See* Tuchmann Dec Ex. H.

Respondents do not know what caused DOJ to change its mind, reverse course, and submit the Application without any such evidence. But a review of the Indictment demonstrates that under the Uruguayan prosecutors' theory of Ms. Goldring's criminal liability, in fact it is *impossible* for the subject accounts to contain the proceeds of that crime. The Indictment describes the alleged crime as follows:

> Indeed, in her capacity as President [of the Brokerages,] the accused appropriated assets entrusted to her by many clients, turning them into the benefit of a third party [meaning other of her clients] despite her obligation to return these assets or make specific use of them.
>
> And the foregoing is so by virtue of the fact that the securities of a large number of clients that were entrusted to her to hold in custody and invest in a reasonable manner, were used by her, without giving prior notice, to pay or settle the losses suffered by other clients, for the high-risk investments that she made.

Tuchmann Dec. Ex. B at 16. Under the Uruguayan prosecutor's own theory, then, all of the allegedly misappropriated assets were used to "pay or settle the losses suffered by other clients" – in other words, all of the funds Ms. Goldring allegedly misappropriated were used to satisfy the high-risk clients' obligations to Jefferies, and therefore by definition, all of the misappropriated assets ended up in Jefferies' coffers, not the accounts the DOJ seeks to restrain on behalf of the Uruguayan prosecutors.

For whatever reason, despite knowing it must provide such evidence and repeatedly telling the Uruguayan authorities the same while serially rejecting their previous requests, after

inexplicably reversing course DOJ has not even deigned to try to comply with the D.C. Circuit's requirement set forth in *Luan* that it show that the proceeds of a criminal offense (let alone any proceeds of the offense Ms. Goldring is actually charged with and thus might be subject to forfeiture) are in the accounts that DOJ only now, two and a half years later, seeks to restrain on the Uruguayan prosecutors' behalf.  Presumably, DOJ ignored this requirement because it knew it would be impossible to satisfy in this case.[11]  But of course, the impossibility of proving what the D.C. Circuit has held is required for DOJ to restrain these accounts is no reason to ignore that requirement.  This is yet another basis to deny the Application.

 C. <u>The Application is Akin to the Fruit of the Poisonous Tree, Specifically the Government's Violation of Ms. Goldring's 4th and 5th Amendment Rights</u>

 As demonstrated by the facts set forth above, the government violated Ms. Goldring's Fourth Amendment and Fifth Amendment rights by coercing Jefferies into serving as an arm of the government for the purpose of unlawfully freezing the Goldring Accounts for at least about five months, and probably longer, without any judicial, statutory, or other authority to support that freeze.  The Court should not countenance the government's violation of Ms. Goldring's Fourth and Fifth Amendment rights, and instead should deny the Application as, in effect, the "fruit of the poisonous tree" that is the government's Fourth and Fifth Amendment violations.

---

[11] While the government has made no effort whatsoever to show that *any* of the assets in the subject accounts are the proceeds of any crime, it is striking that the government is nevertheless seeking to freeze every last dollar and asset in those accounts; if the government had any evidence that some portion of those assets constituted criminal proceeds, one would assume that the government would only attempt to freeze the accounts up to the value of those criminal proceeds.  Instead, the government is taking a maximalist position with minimal – and in fact nonexistent – evidence.

1.  Jefferies Acted at the Direction of DOJ for at Least Five Months Before DOJ
    Filed the Application

The undisputed facts set forth above – most importantly the January 2025 email exchange with Jefferies' outside counsel (Tuchmann Dec. Ex. F) – conclusively establishes that since at least January 21, 2025, but for DOJ's communications to Jefferies, Jefferies would have ceased freezing the Goldring Accounts.  Jefferies is a financial services firm that is closely regulated by DOJ (including by DOJ's Money Laundering and Asset Recovery Section, or "MLARS") with respect to a variety of aspects of Jefferies' business operations, importantly including compliance with money laundering and "know your customer" regulations.  Should DOJ/MLARS find that Jefferies is not complying with those laws and regulations (or even just investigate Jefferies for such violations), Jefferies would undoubtedly suffer significant negative operational and/or financial consequences.

Thus, for DOJ to even hint to Jefferies that DOJ would prefer that the Goldring Accounts remain frozen is tantamount to a concrete request, if not an instruction, by DOJ to Jefferies to freeze the Goldring Accounts (and discovery may uncover such an actual specific request or instruction in any event).  With this communication, whatever its specifics, DOJ used Jefferies as its agent to maintain a freeze on the Goldring Accounts for months, knowing that, unlike DOJ, Jefferies could freeze those accounts without having to comply with the Constitutional or statutory requirements that apply to the government, including the Fourth Amendment, Fifth Amendment, or 28 U.S.C. § 2467.  *See NB v. District of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015) (finding that "the state action requirement is met if there is such a close nexus between the State and the challenged action that seemingly private behavior may be treated as that of the state itself," and that "[t]he requisite nexus generally exists when a private party acts as an agent of the government in relevant respects.")  In this case, DOJ used its overwhelming regulatory power

26

over Jefferies to coerce Jefferies into acting on DOJ's behalf as its agent for the purpose of

maintaining a freeze on the Goldring Accounts since at least January 21, 2025.  That is when

Jefferies informed Ms. Goldring's counsel that it was prepared to unfreeze the Goldring

Accounts and would have done so but for the communications it received from DOJ after

requesting "clearance" from DOJ to unfreeze the accounts as it then wished and intended to do.

*See* Tuchmann Dec. Ex. F.

While Respondents submit that these uncontested facts conclusively establish that

Jefferies served as an agent of DOJ and thus a state actor with respect to freezing the Goldring

Accounts since at least January 21, 2025, to the extent there is any question in the Court's mind

about that determination, or to the extent the Court finds necessary and relevant to its ruling on

the Application the exact date when Jefferies began to serve as a state actor for DOJ in this

respect, Respondents respectfully request that the Court order documentary and deposition

discovery from the government (and permit third party discovery from Jefferies) on this issue

before ruling on the Application.

### a. The Fourth Amendment Violation

If the government of the United States wishes to freeze a financial account, it must do so

pursuant to a warrant or similar order signed by a neutral magistrate, or pursuant to an

established exception to the Fourth Amendment's warrant requirement.  *See Al Haramain*

*Found., Inc. v. U.S. Dep't of Treasury*, 585 F.Supp. 2d 1233, 1262-64 (D.Ore. 2008), *aff'd in*

*part, rev's in part*, 660 F.3d 1019 (9th Cir. 2011), 686 F.3d 965 (9th Cir. 2012); *KindHearts for*

*Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F.Supp.2d 857, 870-72 (N.D. Oh. 2009);

*See also Colello v. S.E.C.*, 908 F. Supp. 738, 753 (C.D. Cal. 1995) (finding that a freeze of bank

accounts is a "seizure" for Fourth Amendment purposes because a "'seizure' of property occurs

when 'there is some meaningful interference with an individual's possessory interest in that property,'" quoting *United States v. Jacobson*, 466 U.S. 109, 113 (1984). *Cf. United States v. Cosme*, 796 F.3d 226, 235-36 (2d Cir. 2015) (finding that an indefinite, warrantless two-year freeze of a criminal defendant's bank accounts violated the Fourth Amendment).

It is true that courts in the D.C. Circuit have not found the Fourth Amendment implicated in "blocking actions" that OFAC executes under the International Emergency Economic Powers Act ("IEEPA"). *See, e.g., Lopez Bello v. Smith*, 651 F.Supp.3d 20, 45 (D.D.C. 2022). However, the special powers Congress granted to the Treasury Department to fight terrorism and other similarly dangerous foreign threats by blocking certain assets through the relevant portions of IEEPA implicate far more dangerous threats to national security and safety than DOJ's role enforcing foreign asset freezes and forfeitures using 28 U.S.C. § 2467 in connection with an alleged misappropriation. Without the particular factors at play involving IEEPA and the threat of international terrorism, this Court should heed the Supreme Court's pronouncement that a "seizure" of property occurs for Fourth Amendment purposes when "there has been some 'meaningful interference with an individual's possessory interests in that property.'" *Lopez Bello*, quoting *United States v. Karo*, 468 U.S. 705, 712 (1984). Restraint of financial accounts pursuant to 28 U.S.C. § 2467, for the alleged crime of misappropriation, indisputably constitutes "meaningful interference" with Respondents' possessory interest in their property in the Goldring Accounts.

But even assuming for the sake of argument that 28 U.S.C. § 2467 applies with the same force as IEEPA in this context to excuse the government's need to comply with the Fourth Amendment when restraining accounts, that is irrelevant to the period of about five months (or more) between at least January 21, 2025 and June 7, 2025 when the government froze

Respondents' assets *without even taking any steps to comply* with any of the requirements of 28

U.S.C. § 2467, or to otherwise comply with the warrant requirement of the Fourth Amendment.

For about five months (at least), the government ignored both the statutory scheme that Congress

created when it enacted 28 U.S.C. § 2467 to implement the MLAT treaty with Uruguay, and the

Fourth Amendment. *See Cosme*, 796 F.2d at 235-36 (stating that while exigent circumstances

may justify freezing financial accounts without a warrant, that exception "does not allow the

perpetual restraint of a defendant's property without a warrant," but rather only "for as long as

reasonably necessary to secure a warrant"). In sum, the DOJ's freezing of the Goldring Accounts

since at least January 21, 2025 through, at a minimum, its communication to Jefferies that

Jefferies was not "clear" to unfreeze the Goldring accounts neither satisfied the requirements of

the Fourth Amendment nor was consistent with any recognized exception to it.

        b.  <u>The Fifth Amendment Violation</u>

       If the government of the United States wishes to freeze a financial account, it must

comply with not only the Fourth Amendment but also the Fifth Amendment's Due Process

clause.  The Due Process clause provides for, if not a pre-seizure hearing, at least a post-seizure

hearing in a reasonable amount of time.  *See United States v. James Daniel Good Real Prop.*,

510 U.S. 43, 52 (1993).  In this case, by failing to provide for a post-seizure hearing for at least

five months while it used Jefferies to freeze the Goldring Accounts, the government violated the

Fifth Amendment. *See United States v. Eight Thousand Eight Hundred and Fifty Dollars*

*($8,850) in U.S. Currency*, 461 U.S. 555, 565 (1983) (defining a "short delay" as a delay of

"perhaps a month or so" as "short" and a delay of "some 18 months" as "quite significant").  An

important component of the Supreme Court's analysis in the *Eight Thousand Eight Hundred and*

*Fifty Dollars ($8,850) in U.S. Currency* case was the government's "diligent pursuit" of pending administrative and civil proceedings after the initial seizure.

Here, by contrast, the government did not act with diligence, but rather to the contrary – the government restrained the accounts using Jefferies in no later than January 2025, almost two years after Uruguay first requested DOJ's assistance in freezing those accounts in around March 2023; and it did not seek an order under 28 U.S.C. § 2467 until around a half year after Uruguayan authorities renewed their request for assistance.  Even then, it is logical to infer that DOJ only sought an order freezing these accounts after Ms. Goldring forced the issue by filing her lawsuit in the Southern District of New York – otherwise, DOJ apparently would have been content to let Jefferies continue to freeze these accounts indefinitely.  Because the Goldring Accounts were first restrained "years ago… and it may take several more years before the underlying criminal prosecution[] and appeals are completed" in Uruguay, the government violated Ms. Goldring's Fifth Amendment rights by not proving her with a hearing.  *In re Seizure of Approximately $12,116,153.16 and Accrued Interest in U.S. Currency*, 903 F. Supp.2d 19, 33-34 (D.D.C. 2012).

        c.   <u>"Fruit of the Poisonous Tree"</u>

Assuming the Court concludes, as it should, that the government's monthslong extralegal and unconstitutional freeze of the Goldring Accounts since at least January 2025 violated the Fourth and/or Fifth Amendments, the Court must then decide what to do about those violations.  Respondents may not sue the federal government or its agents for resulting damages, as Congress has not created a private right of action to redress such violations.  To hold the government accountable, the Court can and should treat the assets that currently remain frozen in the Goldring Accounts as analogous to the fruit of the poisonous tree in the context of a criminal

suppression motion.  Just like when the government seeks to try a defendant with evidence gathered pursuant to a search warrant that was obtained by presenting a judge with an affidavit setting forth incriminating facts that were themselves learned by unconstitutionally intruding into the defendant's home without a warrant in the first place, the Court should bar the government from restraining the Goldring Accounts.  Any other result would make a mockery of the government's obligation to respect Ms. Goldring's Fourth and Fifth Amendment rights, as well as the MLAT process and the detailed and specific statutory scheme that Congress has created in order to implement it.  Any other result would also leave Respondents without any meaningful remedy to the government's statutory and constitutional violations.

This is not a situation where the government learned that a foreign central authority was seeking to restrain accounts pursuant to an MLAT on a Monday and then, to guard against the possibility that the assets in the accounts could be dissipated that Tuesday or Wednesday, briefly restrained those accounts without a court order until the following Monday, or even for a month, while during that whole time it diligently prepared an application to restrain the accounts that it promptly filed with a court.  To the contrary, for at least about five months, after effectively (and possibly literally) instructing Jefferies to restrain the Goldring Accounts, not only did the government fail to file an application with a court to restrain the Goldring Accounts or provide Respondents with a post-restraint hearing, it *failed to even decide* whether it wanted to seek to file an application to restrain the Goldring Accounts – not until Ms. Goldring's lawsuit against Jefferies, and after the government's May 30, 2025 representation to Judge Rakoff that it was

considering whether or not to seek to restrain the Goldring Accounts, did DOJ decide to do so.[12] *See* Tuchmann Dec. ¶ 15.

While this delay is inexcusable on its own, the full history and context of the instant MLAT request make the government's inaction even worse. Not only did the government take at least about five months after it started using Jefferies to freeze the Goldring Accounts to decide to seek judicial approval to formally restrain them, even more inexcusable is that the government was aware of the underlying Uruguayan MLAT request for *more than two years* by the time it decided to seek judicial permission to restrain the Goldring Accounts. There is no indication in the record that the Uruguayan prosecutors ever assuaged DOJ's concerns about the deficiencies in the application DOJ identified in its March 2023 email to Uruguayan authorities; in fact, those deficiencies are not addressed in the Application, and there is no evidence that any assets in the Goldring Accounts are derived from assets belonging to any of the Brokerages' clients – something that is not even possible in light of the Uruguayan prosecutors' theory set forth in the Indictment. DOJ could have filed the Application in March of 2023 (let alone early January 2025, when it instructed Jefferies to continue freezing the Goldring Accounts) just as well as when it actually filed the Application in early June of 2025.

---

[12] DOJ represented to Judge Rakoff and Ms. Goldring (through her counsel) during a May 30, 2025 telephone conference that it would decide during the following week whether or not it would seek to restrain the Goldring Accounts and then notify Judge Rakoff and the parties. Tuchmann Dec. ¶ 15. Though the required certification from a DOJ official that the restraint is in the interest of justice is dated June 3, 2025, DOJ chose not to inform Ms. Goldring's counsel of this decision until about 3:40 a.m. on Saturday June 7, by emailing counsel a copy of the Application. Apparently, Judge Rakoff was not informed until counsel for Jefferies emailed his chambers on June 9, 2025.

## <u>CONCLUSION</u>

For the reasons stated above, Respondents respectfully urge the Court to deny the Application. Alternatively, if the Court deems it necessary to resolve any contested issue, Respondents respectfully request that the Court order that Respondents be permitted to take discovery from the government and third-party Jefferies, to determine when Jefferies began acting as an arm of the DOJ in connection with Jefferies freezing the Goldring Accounts, as well as any other issues the Court deems relevant, such as the government's unexplained delay of nearly two and a half years in seeking to enforce the December 2022 Order before reversing course despite not receiving the information it had requested from the Uruguayan authorities.

Respectfully submitted,

*/s/ Jolie Apicella*
Jolie Apicella (Bar No. NY0614)
Wiggin and Dana LLP
437 Madison Avenue, 35th Floor
New York NY 10022
T: 212-551-2844
japicella@wiggin.com

Paul A. Tuchmann (pro hac vice application forthcoming)
Robert Hoff (pro hac vice application forthcoming)
WIGGIN & DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: 203-498-4336
ptuchmann@wiggin.com
rhoff@wiggin.com

*Attorneys for respondents*
*Sara Silvia Goldring Waisbiot*
*Martin Cukier Goldring*
*Daniel Cukier Goldring*
*Carinalli Corp.*
*Comptoir International Corp.*
*United Maritime Capital, LLC*