# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN RE: ALL ASSETS HELD IN
ACCOUNT JW3083094 IN THE
NAME OF CARINALLI, S.A. AT
JEFFERIES, LLC, *et al.*

Case No. 25-mc-96-TSC-MJS

## <u>REPORT AND RECOMMENDATION</u>

Based on a treaty request from the Oriental Republic of Uruguay, the United States of America seeks a restraining order to preserve certain U.S.-based assets that may be subject to forfeiture in criminal proceedings underway in Uruguay. *See* 28 U.S.C. § 2467(d)(3). Those Uruguayan proceedings, according to the Government, are premised on allegations that Sara Silvia Goldring Waisbiot ("Goldring") engaged in "misappropriation and fraud in her operation of client accounts and investments through brokerage companies she controlled." (*See* ECF No. 1 ("Gov't App.") at 2.) The Government asks the Court to restrain all assets in eleven bank accounts—four at Morgan Stanley and seven at Jefferies, LLC ("Jefferies")—in the names of Goldring, her business partners (and sons), and her businesses. Goldring and others oppose the Government's request, at least in part. The matter is before the undersigned on a referral from District Judge Tanya S. Chutkan. Based on a careful assessment of the governing authorities, the parties' briefing, and the arguments of counsel during the recent hearing, the undersigned **RECOMMENDS** that the Court **GRANT** the Government's application and enter the requested restraining order.[1]

---

[1] Because the restraining order requested by the United States would be considered "dispositive" relief, the Court's ruling takes the form of a report and recommendation to the District Judge. *See* Fed. R. Civ. P. 72(b); Local Civil Rule 72.3(a)(2); *In re Enf't of a Restraining Order by the Republic of India* ("*India*"), 2024 WL 5375481, at *1 n.1 (D.D.C. Nov. 18, 2024) (issuing R&R on Section 2467(d)(3) application).

## FACTUAL AND PROCEDURAL BACKGROUND

According to information provided by Uruguayan authorities, Goldring is the majority owner and chair of two Uruguayan brokerage firms, United Brokers, S.A. and Custodia de Valores Mobiliarios, S.A. In 2022, Uruguayan prosecuting authorities initiated an investigation based on complaints from private investors and the Uruguayan Central Bank alleging that Goldring and others used those brokerage firms to engage in fraud and related misconduct, resulting in millions of dollars in alleged losses to her clients.

As part of that investigation, Uruguayan authorities identified several bank accounts at Morgan Stanley and Jefferies in New York that Goldring beneficially owns and that are under her control or joint control with her adult sons (Martin Cukier, Daniel Cukier, and Dario Cukier). In December 2022, a Uruguayan court—Uruguay's Second Civil Criminal Court of First Instance Specialized in Organized Crime of Montevideo—acted on applications from the prosecution and certain victims to issue Decree No. 1368/2022, which found a sufficient basis under Uruguayan law to order restraint of the accounts and to issue a letter rogatory asking the United States for assistance. A few days later, the Uruguayan court issued the letter rogatory (Oficio No. 1065/2022) and formally requested that the United States take appropriate steps to freeze the accounts. These two "2022 Orders" form the basis for the Government's application here.[2]

The 2022 Orders encompass all assets held in the following accounts (with the named account holder(s) reflected in parentheses):

1.    Jefferies # JW3083094 (Carinalli, S.A.)

2.    Jefferies # JW3125077 (Carinalli, S.A).

3.    Jefferies # JW3125341 (Comptoir International Corp.)

---

[2] The Court follows the Government's lead in referring to both Uruguayan court documents collectively. (*See* Gov't App. at 3; *see also* ECF No. 13 ("Hrg. Tr.") at 64:3–9.)

4.      Jefferies # JW3070000 (Sara Goldring Waisbiot and Daniel Cukier)

5.      Jefferies # JW3078888 (Sara Goldring Waisbiot and Daniel Cukier)

6.      Jefferies # JW3078904 (Sara Goldring Waisbiot and Martin Cukier)

7.      Jefferies # JW3073491 (United Maritime Capital, LLC)

8.      Morgan Stanley # 711-891670 (Sara Goldring Waisbot and Martin Cukier Goldring)

9.      Morgan Stanley # 711-891671 (Sara Silvia Cukier Goldring and Dario Cukier Goldring)

10.     Morgan Stanley # 741-073746 (United Brokers S.A. c/o M Cukier Goldring, SS Goldring Waisbot, CM)

11.     Morgan Stanley # 711-045184 (United Maritime Capital, LLC)

(ECF No. 1-1 at 2, 16–18, 33–34).[3]

Uruguay made its mutual legal assistance requests soon after the Uruguayan court issued the 2022 Orders, but the U.S. Government "determined that it needed additional information" and "worked closely with Uruguay over the course of an approximately two-year period to obtain the information needed." (ECF No. 8-4 ¶ 9, Decl. of Jesse Ormsby, DOJ, Criminal Division, Office of International Affairs Attorney.) Through that process, Uruguay "provided multiple responses … supplementing" its requests, and the United States ultimately agreed to furnish assistance. (*Id.*)

Meanwhile, the Uruguayan court issued a 2023 Order of Formalization "initiating the formal phase of the criminal proceedings against Goldring and naming her as the 'alleged author' of a 'continuous crime of … [misappropriation].'" (Gov't App. at 8; *see also* ECF No. 8-2 at 16.)[4]

---

[3] The 2022 Orders identified additional accounts beyond this list, but the Government reports that the Uruguayan authorities no longer seek restraint of those accounts. The Court does not address them further.

[4] According to the Government, an Order of Formalization under Uruguayan law "is a judicial decision finding that there are sufficient objective elements of a crime and that the defendant is responsible for the offense." (Gov't App. at 8.) Respondents' description is relatively consistent; they characterize the Order of Formalization as "the Uruguayan equivalent of an indictment[.]" (ECF No. 5 ("Opp'n") at 15.).

According to the Government's translation, the criminal offense of "misappropriation" is defined as follows in Article 351 of the Uruguayan Penal Code: "Whoever appropriates, converting it to their benefit or that of a third party, money or other movable thing, which had been entrusted to them or delivered by any title that implies an obligation to return it or to make a specific use of it, will be punished with three months in arrest to four years in prison." Among other underlying findings, the statement of facts supporting the Order of Formalization specified that:

- "[T]he defendant appropriated, for the benefit of a third party, assets that had been entrusted to her and delivered to her by many of her clients, and which she had an obligation to return or use for a specific purpose."

- "The losses suffered were so great that the defendant acknowledged before this Prosecutor's Office that, in order to prevent a run on the company when customers found out what was happening, she concealed information from them."

- "[T]he account statements sent by the company to its clients did not reflect the losses or the economic reality of each client, which meant that, as [the clients] were unaware of the serious losses suffered, they were unable to make decisions or give instructions to the broker to prevent the continued flight of their capital in defense of their own interests."

- "[T]he defendant falsified the account statements she sent to her clients so that they would not notice the considerable losses they were suffering, which also benefitted Ms. GOLDRING and her company because, in this artificial way, the defendant prevented clients from leaving and, in many cases, from withdrawing or attempting to withdraw the balance of the capital they still had with CVM."

- "Keeping these clients in her portfolio allowed the defendant to continue carrying out investment transactions and, as is logical, in the event of profits, to collect the commissions for her own benefit."

(ECF No. 8-2 at 3.)

At some point during that process, the Central Bank of Uruguay sent a letter to Jefferies in New York, to advise about the ongoing criminal investigation. (ECF No. 5-19.) Possibly in response, Jefferies saw fit to freeze Goldring's accounts in or about August 2022. (*See* ECF Nos. 5-17, 5-18.) This development prompted Goldring—years later, in April 2025—to sue Jefferies in the U.S. District Court for the Southern District of New York, alleging that Jefferies "has frozen

[her] accounts for more than two and a half years without any lawful basis" and seeking injunctive relief directing Jefferies to unfreeze the accounts. (*See Goldring Waisbiot v. Jefferies, LLC*, No. 25-cv-3606-JSR, Compl. at 1 (S.D.N.Y., filed Apr. 30, 2025).) That case continues, but the Southern District of New York recently stayed its proceedings pending this Court's resolution of the Government's application to restrain the same contested assets under 28 U.S.C. § 2467(d)(3).

In this Court, the Government filed its application on June 7, 2025. (*See* Gov't App.) Although proceedings of this sort under Section 2467(d)(3) frequently play out on an *ex parte* basis (and properly so), the Government here provided notice of its application to Goldring. And in response, Goldring and others—Martin Cukier Goldring, Daniel Cukier Goldring, Carinalli Corp., Comptoir International Corp., and United Maritime Capital, LLC (together with Goldring, "Respondents")—appeared to oppose the Government's application in part. (ECF No. 5 ("Opp'n").) After the Government filed its reply (ECF No. 8 ("Reply")), the Court convened a hearing on September 12, 2025 (*see* ECF No. 13 ("Hrg. Tr.")). This ruling now follows.

## STATUTORY AND LEGAL FRAMEWORK

The United States seeks relief pursuant to 28 U.S.C. § 2467(d)(3), which empowers federal courts to issue restraining orders "to preserve the availability of property subject to civil or criminal forfeiture under foreign law … at any time before or after the initiation of forfeiture proceedings by a foreign nation." *Id.* § 2467(d)(3)(A)(i). Any restraining order must be issued "consistent with subparagraphs (A), (C), and (E) of subparagraph [(d)](1) and the procedural due process protections for a restraining order under [18 U.S.C. § 983(j)]." *Id.* § 2467(d)(3)(A)(ii)(I). For these purposes, courts: (i) "may rely on information set forth in an affidavit describing the nature of the proceeding or investigation underway in the foreign country, and setting forth a reasonable basis to believe that the property to be restrained will be named in a judgment of forfeiture at the

conclusion of such proceeding"; or (ii) "may register and enforce a restraining order that has been issued by a court of competent jurisdiction in the foreign country and certified by the Attorney General pursuant to subsection (b)(2)." *Id.* § 2467(d)(3)(B); *see id.* § 2467(b)(2).

Broken out in elemental terms, then, the controlling statute requires the Government to demonstrate that five criteria are satisfied to secure a restraining order:

(1)    the foreign nation and the United States must be parties to a "treaty or other formal international agreement in effect providing for mutual forfeiture assistance," 28 U.S.C. § 2467(a)(1) (defining "foreign nation");

(2)    the request must be supported by *either* (i) a satisfactory evidentiary affidavit *or* (ii) an appropriate certification from the Attorney General, *id.* § 2467(d)(3)(B);

(3)    the foreign order must have been issued in a manner "consistent with the requirements of due process," *id.* § 2467(d)(1)(A) & (d)(3)(A)(ii)(I);

(4)    the foreign court must have had "subject-matter jurisdiction," *id.* § 2467(d)(1)(C) & (d)(3)(A)(ii)(I); and

(5)    the foreign order must not have been obtained "by fraud," *id.* § 2467(d)(1)(E) & (d)(3)(A)(ii)(I).

*India*, 2024 WL 5375481, at *2 (D.D.C. Nov. 18, 2024)*; see also In re Bank of Am. Account No. XXXXXX*, 2020 WL 11036329, at *2 (D.D.C. Dec. 1, 2020) (enumerating these same five factors).

## DISCUSSION

The Court begins in Section I by evaluating the Government's application against the five core criteria for relief under the statute. All are straightforwardly met here. Respondents concede as much. Instead, Respondents contest the Government's application for a restraining order on other grounds, which the Court addresses in Section II below.

## I.    The Core Statutory Criteria Under Section 2467(d)(3) Are Satisfied

***First***, the United States and Uruguay are parties to a Mutual Legal Assistance Treaty. *See Treaty Between the Government of the United States of America and the Government of the*

*Oriental Republic of Uruguay on Mutual Legal Assistance in Criminal Matters,* U.S.-Uru., May 6, 1991, S. TREATY DOC. NO. 102-19 (1991). The treaty obligates the United States to assist Uruguay in forfeiture-related matters, among others. *See id*. at Art. 2 and Art. 22 § 2.[5] Following the lead of prior rulings from this District, "[t]he Court defers to the Executive's reasonable conclusion that the treat[y] ha[s] been properly invoked in this instance." *Bank of Am.*, 2020 WL 11036329, at *3 (citing *In re Restraint of All Assets Contained or Formerly Contained in Certain Inv. Accts. at UBS Fin. Servs., Inc.*, 860 F. Supp. 2d 32, 41 (D.D.C. 2012)).

***Second***, the U.S. Attorney General—acting through her appropriate designee, the Chief of the Money Laundering and Asset Recovery Section of the U.S. Department of Justice—has certified that enforcement of the underlying restraining orders from Uruguay is "in the interest of justice." (*See* ECF No. 1-1.) Under the statute, that determination is "final" and "not subject to … judicial review." 28 U.S.C. § 2467(b)(2); *see also UBS Fin. Servs.*, 860 F. Supp. 2d at 40 ("Congress left it to the Attorney General to determine whether a request should be certified and presented to the district court, and that determination is not subject to judicial review.").

***Third***, the Government has shown that the 2022 Orders were issued in keeping with appropriate due-process safeguards. On this point, the Court starts from "the premise that the foreign proceedings or procedures are in fact compatible with due process." *UBS Fin. Servs.*, 860 F. Supp. 2d at 42. After all, a "district court should not lightly sit in judgment of the legal system of a foreign sovereign," as doing so "would run the risk of entangling the federal courts in matters of foreign affairs." *Id.* And against that presumptive backdrop, the Government explains that, in

---

[5] As stated in Article 2 of the treaty, the U.S. and Uruguay have to mutually assist on matters concerning "[f]orfeiture, transfer of forfeited assets, as well as matters involving restitution and the collection of fines imposed as sentences in criminal prosecutions[.]" Relatedly, Section 2 of Article 22 reads: "The Parties shall assist each other as permitted by their respective laws in proceedings relating to forfeiture, restitution to the victims of crime, or the collection of fines imposed as a sentence in criminal prosecutions."

keeping with the Criminal Penal Procedure of Uruguay: (1) the 2022 Orders were issued by a neutral judicial officer who found a sufficient basis to order "precautionary measures" in the form of a restraint on Goldring's assets; (2) Goldring received notice of the 2022 Orders; (3) Goldring had the right to appeal the Uruguayan orders imposing the restraint(s); and (4) the Uruguayan court held a hearing to formalize the criminal proceedings against Goldring, in connection with which it considered Goldring's opposition. (*See* Gov't App. at 12–15.) In short, as part of the underlying Uruguayan proceedings, Goldring received notice and an opportunity to be heard on the proposed restraints. (*Id.* at 8 ("According to Uruguayan authorities, Goldring … has been informed of the allegations against her and has participated in the criminal proceedings" and her "rights include the right to challenge the Uruguayan Court's orders to restrain accounts in the United States.").) These procedures are consistent with traditional American notions of due process. *Gang Luan v. United States*, 722 F.3d 388, 399 (D.C. Cir. 2013) (finding due process satisfied where the defendant had an opportunity to challenge the restraint at a hearing in Hong Kong, among other considerations); *see also India*, 2024 WL 5375481, at *3 (similar); *Bank of Am.*, 2020 WL 11036329, at *4 (finding sufficient due process protections based on procedures arguably less robust than here—*i.e.*, where French order was issued *ex parte*, without notice and an opportunity to appear, but allowed for later appeal); *UBS Fin. Servs.*, 860 F. Supp. 2d at 42–43 (similar).

**Fourth**, as to subject-matter jurisdiction, "[i]t is generally presumed that foreign courts have subject matter jurisdiction over the disputes they adjudicate." *Bank of Am.*, 2020 WL 11036329, at *4 (citing *G. Geerlings Exp. B.V. v. Van Hoekelen Greenhouses, Inc.*, 2016 WL 6834033, at *9 (M.D. Pa. Nov. 21, 2016)). The Court sees no basis to depart from that sensible proposition here. The 2022 Orders were issued by the Court of First Instance in Criminal Matters, Specialized in Organized Crime of 2nd Term of the City of Montevideo, Oriental Republic of

Uruguay. (ECF No. 1-1 at 2, 15, 32.) As the Government notes, the Uruguayan court explains in its orders—which the Attorney General's designee certified—that it was the proper issuing authority. (*Id.* at 37–38, 51–52; Gov't App. at 15.)

And **fifth**, the Court does not see any basis to suspect that the 2022 Orders were obtained through any sort of fraud on the part of the Uruguayan authorities. To the contrary, the Court's review of the Uruguayan order and the accompanying letter rogatory amply reinforces that the Uruguayan proceedings were consistent with due process and regularity for the reasons explained. There is no indication of anything approaching fraud. *See Bank of Am.*, 2020 WL 11036329, at *4 (observing that "fraudulent judicial actions are incompatible with due process").

\*    \*    \*

As indicated, Respondents do not contest any of these criteria, certainly not in their written briefing. Respondents' counsel confirmed as much during the hearing. (Hrg. Tr. 28:7–29:10.) At most, counsel raised for the first time at the hearing a new argument bearing indirectly on the first, treaty-focused factor: although Respondents recognize that the U.S. and Uruguay are parties to a treaty providing for mutual legal assistance, Respondents suggest the 2022 Orders fall beyond the reach of that treaty because they are functionally equivalent to a restitution order rather than a forfeiture order. (*Id.* 29:16–38:32.) For several reasons, the Court rejects this argument.

For starters, Respondents failed to raise it in their written brief. Absent exceptional circumstances, "arguments raised for the first time at oral argument are forfeited." *U.S. ex rel. Davis v. Dist. of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015); *see Cent. Am. Bank for Econ. Integration v. Mossi*, 2025 WL 2732731, at *12 (D.D.C. Sept. 25, 2025) (refusing to consider argument on this basis); *Silver v. Internal Rev. Serv.*, 531 F. Supp. 3d 346, 360 n.5 (D.D.C. 2021) (same). Respondents point to no exceptional circumstances here. During the hearing, counsel tried

to explain the briefing omission by claiming that the argument only became apparent after counsel reviewed an English translation of one of the Uruguayan court documents that was filed with the Government's reply. But even taken at face value, that explanation comes up short. The factual background of Respondents' brief includes several sections editorializing the DOJ's back and forth with Uruguay on the 2022 Orders in the lead-up to this action; and at one point, Respondents cite an email message from the DOJ to the Uruguayan authorities—an email message Respondents include as an exhibit to their brief, no less—stating that "U.S. law does not allow assistance for 'restraint orders related to restitution/compensation' of victims, only for criminal forfeiture." (Opp'n at 23 (citing ECF No. 5-12 at 4).)[6] In other words, the factual predicate for this point— whether the underlying foreign orders were aimed at restitution or forfeiture—was plainly apparent to Respondents when they filed their brief, but they chose not to press any legal argument based on it. The Court therefore deems the argument forfeited and declines to consider it.

But even on its merits, Respondents' newfound argument would miss the mark. After all, the 2022 Orders were certified by the Attorney General's designee pursuant to Section 2467(b)(2), and that certification "shall be final and not subject to … judicial review." 28 U.S.C. § 2467(b)(2). Nothing in the statute "authorizes or requires this Court to pierce the veil of authority behind a request for legal assistance." *UBS Fin. Servs*, 860 F. Supp. 2d at 40. "Instead, consistent with the general preference to leave matters of foreign affairs in the hands of the Executive, Congress left it to the Attorney General to determine whether a request should be certified and presented to the district court[.]" *Id.* As the Second Circuit recently recognized, "Section 2467 is unique in its role as a *discretionary policy tool of international relations* that courts apply within the otherwise routinized realm of asset forfeiture." *In re Enf't Of Philippine Forfeiture Judgment Against All*

---

[6] Briefing citations are to the page numbers assigned by the Court's electronic case-filing system.

*Assets Of Arelma, S.A.* ("*Arelma*"), --- F.4th ----, 2025 WL 2383067, at *4, 8 (2d Cir. Aug. 18, 2025) (emphasis added). The Court believes these "unique" policy implications fortify the reasons it cannot second-guess the Attorney General's determination that the underlying Uruguayan orders are the sort of foreign orders that are enforceable under Section 2467, assuming the other statutory criteria are met. This takeaway seems particularly appropriate against Respondents' specific theory, considering that their own exhibits reflect that DOJ was keenly focused on whether the underlying Uruguayan orders constituted forfeiture orders (as opposed to restitution orders) for purposes of coverage under the treaty and statutory scheme. (*See* ECF No. 5-12 (email from DOJ to Uruguayan authorities asking whether the restraint aimed "to secure forfeiture resulting from a future criminal conviction" or "restitution or compensation to the victims").)

Accordingly, Respondents' restitution-versus-forfeiture argument does not provide a basis to deny the Government's requested restraining order.

## II.    Respondents' Other Arguments Against Enforcement Are Unavailing

Concluding that the five "core criteria" under Section 2467 are satisfied as to the 2022 Orders, the Court next takes up Respondents' various arguments against relief. Specifically, they argue that: (1) the Government cannot establish "dual forfeitability"; (2) the Government cannot establish what Respondents call "dual restrainability"; and (3) the Court should reject any restraining order on constitutional grounds on the theory that the Government improperly directed Jefferies to freeze the accounts prior to seeking judicial relief, which Respondents insist was a violation of their Fourth and Fifth Amendment rights. None of these arguments prevails.

Before explaining why, the Court pauses to emphasize the limited scope of Respondents' opposition. In their briefing, Respondents "take no position" on the accounts at Morgan Stanley, and during the hearing, Respondents' counsel directly confirmed that they oppose the

Government's application only as to certain accounts at Jefferies (the same group of accounts at issue in the S.D.N.Y. lawsuit): Accounts 1, 2, 3, 6, and 7 in the list above. Accordingly, even if the Court were to agree with Respondents on any of their arguments against relief—and it does not—the Court would still deem it appropriate to issue a restraining order as to the remaining, unchallenged accounts: Accounts 4, 5, 8, 9, 10, and 11 in the list above. *See supra* pp. 2–3.

With that context, the Court turns to Respondents' tripartite arguments against relief as to the contested accounts at Jefferies: Accounts 1, 2, 3, 6, and 7.

### A.    Dual Forfeitability

First up, Respondents argue that to preserve assets through a restraining order under Section 2467(d)(3), the Government must establish "dual forfeitability"—meaning the underlying violation(s) of foreign law not only gives rise to forfeiture under Uruguayan law, but also could qualify for forfeiture under U.S. law if the offense(s) were committed in the United States.[7] Respondents insist that the Government fails to make that showing. For its part, the Government disputes that dual forfeitability is a necessary element at this stage, but it says that it meets that showing regardless. The Government has the better of these arguments.

#### 1.    Dual Forfeitability Under Section 2467(d)(3) Generally

As a starting point, the Court considers whether a finding of dual forfeitability is even required for purposes of issuing an interim restraining order to preserve property under Section 2467(d)(3). At least two judges in this District have ruled that it is not. *See Bank of Am.,* 2020 WL 11036329, at *2 (Faruqui, M.J.); *In re Enf't of Restraining Order from Honduras* ("*Honduras*"), No. 21-mc-40-CJN, ECF No. 24, Order at 4–5 (D.D.C. June 1, 2023) (Nichols, J.) ("Dual forfeitability applies when the Government seeks to enforce a *final* order of forfeiture, not when

---

[7] Respondents do not dispute there is a basis for forfeiture here under Uruguayan law. (Hrg. Tr. 46:2–11.)

(as here) the Government seeks to enforce a restraining order pending final forfeiture proceedings.") (emphasis in original). And the undersigned previously recognized that possibility but ultimately found it unnecessary to adopt a firm view. *See India*, 2024 WL 5375481, at *4 n.4 (Sharbaugh, M.J.). On further reflection, the undersigned finds persuasive the straightforward textual analysis outlined by Magistrate Judge Faruqui and Judge Nichols in the above-cited cases. As they explain, the concept of dual forfeitability derives from the statute's definition of "forfeiture or confiscation *judgment*" in subsection (a)(2)(A). *See* 28 U.S.C. § 2467(a)(2)(A) (emphasis added). So dual forfeitability applies to the enforcement of a *judgment* based on the statutory requirements found in *subsection (d)(1)*. By contrast, the requirements for issuance of a restraining order to preserve property (as here) are found *in subsection (d)(3)*, which makes no mention of the term "*judgment*." On that basis, those rulings explained that while the Government would certainly "have to prove dual forfeitability when it subsequently applies to enforce a foreign final *judgment*," the issue "has no bearing at [the] initial stage" of a restraining order. *Bank of Am.,* 2020 WL 11036329, at *2 & n.3 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) for the proposition that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended"); *Honduras*, 21-mc-40, ECF No. 24 at 4–5 (similar); *see also UBS Fin. Servs.*, 860 F. Supp. 2d at 41 (observing that § 2467(d)(3) "does not expressly incorporate the dual forfeiture requirement that applies to final orders of forfeiture," but proceeding to find it satisfied regardless).

Against these cases, Respondents invoke the D.C. Circuit's decision in *Luan*, 722 F.3d 388. In *Luan*, the Circuit affirmed the entry of a restraining order under Section 2467(d)(3) after considering and rejecting several arguments as to why the underlying foreign forfeiture order was allegedly issued without due process. *See id.* at 393–400. The issue of "dual forfeitability" at the

restraining order stage, however, was not squarely presented to—much less analyzed in any way by—the Circuit. In the course of summarizing the statutory scheme, however, the Circuit did state that a court's "authorization" to issue a restraining order to preserve property under Section 2467(d)(3) "applies" when "the property to be restrained represents the suspected proceeds of a 'violation of foreign law that would constitute a violation or an offense for which property could be forfeited under Federal law if the offense were committed in the United States.'" *Id.* at 392 (quoting 28 U.S.C. § 2467(a)(2)(A)). In other words, the Circuit's ruling can reasonably be read to suggest—at least in passing—that dual forfeitability was a relevant consideration under Section 2467 even at the restraining order stage. But beyond that reference, the Circuit only concluded there was "no dispute" that such a showing was satisfied in that case. *Id.* at 392 & n.3. The Circuit simply followed the parties' lead and treated the criterion as a given. Given that full context, the undersigned is dubious that the Circuit's passing mention of this point was meant to solidify dual forfeitability as a necessary and indispensable requirement under subsection (d)(3). And if writing on a blank slate, the undersigned would follow the lead of Magistrate Judge Faruqui and Judge Nichols and hold that no dual forfeitability showing is required here. But the Court must apply the law as stated by the D.C. Circuit—certainly in a published opinion, as is true here.[8]

The Court therefore proceeds to assess the Government's alternative argument that, even if dual forfeitability is a required showing at this stage, it is satisfied here.

### 2. Dual Forfeitability On These Facts

The Government posits that if the offense conduct underlying the Uruguayan criminal proceedings were committed in the United States, it would support criminal charges under U.S. federal law pursuant to various statutes giving rise to forfeiture, including 18 U.S.C. § 1343 (wire

---

[8] The Court hopes that the D.C. Circuit will clarify this issue one way or another in a future case.

fraud), 18 U.S.C. § 1348 (securities fraud), and 18 U.S.C. § 2314 (interstate transportation of stolen property). (Gov't App. at 17–18; Reply at 6–10.) Respondents take a different tack. They say the Court's inquiry should focus on the specific U.S. analog to the specific foreign offense(s) officially charged, rather than the substance of the underlying offense conduct. (Opp'n at 25–27.) And through that lens, Respondents insist that because Goldring was only charged with "misappropriation" in the Order of Formalization issued in Uruguayan court—"and never with fraud of any kind" (*id.* at 26)—the Government cannot rely on fraud-based U.S. criminal analogs for purposes of a dual forfeitability showing. Beyond that conceptual defense, though, Respondents do not contest that the underlying conduct charged in Uruguay could support a charge for wire fraud or securities fraud under U.S. law, though they do contest the Government's invocation of a potential U.S. charge for interstate transportation of stolen property on a factual basis—emphasizing that the Order of Formalization does not even allege that any funds crossed state (or international) borders after they were allegedly misappropriated.

Respondents get the relevant legal focus wrong. The Court's inquiry is not limited to some sort of mechanistic comparison of the actual criminal offense charged in the foreign jurisdiction to the closest-fit analog of the foreign offense under U.S. federal criminal law (assuming one even exists). For purposes of this analysis, the Court looks to the underlying acts—*i.e.*, the *substance* of the offense conduct giving rise to the foreign criminal proceedings, and not merely the formal offense(s) the foreign jurisdiction opted to charge. *See Bank of Am.*, 2020 WL 11036329, at *2 n.2 ("Dual forfeitability requires that the foreign criminal *conduct* supporting the forfeiture request also give rise to forfeiture had it been committed in the United States.") (emphasis added); *see also In re Any & all funds or other assets in Brown Bros. Harriman & Co. Acct. No. 8870792 in name of Tiger Eye Invs., Ltd.*, 601 F. Supp. 2d 252, 255 (D.D.C. 2009) (describing dual forfeitability as

focused on "the *acts* forming the basis for the foreign judgment") (emphasis added), *aff'd*, 613 F.3d 1122 (D.C. Cir. 2010). And for good reason. After all, criminal laws can vary widely from country to country, and there are surely criminal offenses that exist outside the United States that do not have a direct mirror offense under U.S. criminal law, even though the underlying offense conduct—charged differently—might. More, as the Government rightly notes (*see* Reply at 6; Hrg. Tr. at 14:10–22), the Uruguayan proceedings remain ongoing, so the Uruguayan prosecuting authorities may still be permitted to formally charge other offenses prior to final judgment. This practical consideration further supports a focus on the underlying acts underpinning the foreign proceedings, rather than considering only the formal charge(s) alone. And more still, the Court returns to the Second Circuit's apt characterization of Section 2467 as a "discretionary policy tool of international relations[,]" *Arelma,* 2025 WL 2383067, at *4, and that understanding counsels for a more flexible and practical approach to this issue than the rigid proposal urged by Respondents.

Thus, in evaluating dual forfeitability, the Court asks whether the alleged offense conduct—the underlying acts and omissions themselves—giving rise to the criminal charges in Uruguay would support any criminal charge(s) under U.S. federal law that would trigger forfeiture, without strictly focusing on the limited contours of the "Misappropriation" offense under Uruguayan law that is formally charged in the Order of Formalization. And framed accordingly, the straightforward answer to that question is an affirmative one.

As set forth in the Order of Formalization, the Uruguayan criminal proceedings against Goldring are premised on factual findings that she "concealed information" from her customers, including through "falsified … account statements … so that they would not notice the considerable losses they were suffering," which benefited Goldring and her brokerages, both

16

financially and otherwise. (ECF No. 8-2 at 3; *id.* at 5 (finding that Goldring personally "instructed the employees to … send clients account statements that did not reflect the actual losses they had suffered, thus concealing the information from them").) Insofar as those "falsified" statements were sent electronically, Goldring's alleged actions could support a charge for wire fraud under U.S. law. *See* 18 U.S.C. § 1343. Similarly, Goldring's alleged falsification of customer accounts statements in connection with the purchase or sale of regulated securities could likewise support a charge of securities fraud under U.S. law. *See* 18 U.S.C. § 1348. (*See* Gov't App. at 17–18; Reply at 6–9.) And both wire fraud and securities fraud give rise to forfeiture under U.S. law. *See* 18 U.S.C. § 981(a)(1)(C). Again, Respondents do not contest these takeaways. The simply argue that the Court cannot consider them because Goldring is not formally charged with any fraud offense under Uruguayan law. But that argument rests on a flawed premise for the reasons explained.

In sum, assuming the Government needs to demonstrate dual forfeitability for purposes of obtaining a restraining order under Section 2467(d)(3), the Court concludes it has done so here.[9]

## B.    Dual "Restrainability"

Next, Respondents argue that the Government's requested restraining order cannot issue because it fails to show that "the assets it seeks to restrain pursuant to the foreign court order are *traceable proceeds* of that offense." (Opp'n at 27–28 (emphasis in original).) In other words, Respondents insist the Government must show that the proceeds of the Uruguayan criminal offense with which Goldring is charged are traceable to the accounts the Government seeks to restrain.

They ground this argument in the general principle embodied in U.S. forfeiture law that, at least in many circumstances "the government may only restrain assets it can demonstrate have a

---

[9] Because the Court agrees that the underlying offense conduct could support charges for wire fraud and securities fraud under U.S. law, it does not reach the Government's separate theory that the alleged acts could give rise to a U.S. charge for interstate transportation of stolen property under 18 U.S.C. § 2314.

nexus to the alleged or suspected offenses." (*Id.* at 28 ("While other countries may have forfeiture regimes that permit their governments to restrain assets that belong to a person charged with … a crime, regardless of whether or not those assets have any connection to that crime, the United States holds the presumption of innocence in greater regard.") (citing *Kaley v. United States*, 571 U.S. 320, 323–24 (2014); Fed. R. Crim. P. 32.2(b)(1)(A)).) But as the Government correctly responds (*see* Reply at 12–13), Section 2467(d)(3) contemplates that any property to be preserved through a restraining order be "subject to civil or criminal forfeiture under *foreign law*." So the salient question, if any, would be whether Uruguayan law permits forfeiture absent tracing, and Respondents present no argument—let alone authority—to suggest that it does not. And frankly, the Court does not even need to probe that question because the Government's application is accompanied by an Attorney General certification. *See* 28 U.S.C. § 2467(d)(3)(B) (providing that courts can rely on *either* (i) an affidavit "setting forth a reasonable basis to believe that the property to be restrained will be named in a judgment of forfeiture at the conclusion of [the foreign] proceeding" *or* (ii) a restraining order issued by the foreign country "certified by the Attorney General pursuant to subsection (b)(2)"). But even still, the Government's briefing explains that Uruguayan law does, indeed, authorize the pretrial restraint of "any assets belonging to the accused, including untainted substitute assets," *i.e.*, without specific tracing. (Reply at 13.)[10]

Incidentally, another court in this District recently rejected a similar traceability argument in denying a motion to dissolve a Section 2467(d)(3) restraining order. *See In re Enf't of a*

---

[10] Even if the Court were required to assess traceability under U.S. law, the Government notes that Congress can expressly authorize the pretrial restraint of property that lacks a nexus to the underlying criminal offense. (Reply at 12 (citing *United States v. Chamberlain*, 688 F.3d 290, 297 (4th Cir. 2017), for the point that Congress can "permit the government to restrain both tainted and untainted assets before trial," where it "clearly provided for such authority").) And since Section 2467(d)(3) authorizes the pretrial restraint of property subject to forfeiture "under foreign law," and since some foreign laws authorize pretrial restraint of untainted assets, the Government says that Section 2467(d)(3) is such an authorization. (*See id.*) That strikes the Court as a sensible proposition, but given the analysis above, the Court need not adopt it here.

*Restraining Order Against Five Parcels of Real Property*, No. 24-mc-83, ECF No. 18, Mem. Op. & Order at 26–27 (D.D.C. Sept. 26, 2025). In that case, Judge Sullivan considered an argument— framed through a due-process lens—that courts cannot rely on Section 2467(d)(3) to impose "restraints of property that are not directly tied or traced to the alleged unlawful activity." *Id.* at 26. Recognizing that such restraints can be "impermissible under the American system," Judge Sullivan identified no authority for the proposition that "U.S. courts cannot enforce restraining orders from other countries that permit such restraints." *See id.* at 26–27. So, too, here.

In sum, Respondents' "dual restrainability" argument is unavailing.[11]

### C.    Respondents' Constitutional And Exclusionary Arguments

As a final line of defense, Respondents implore the Court to deny the requested restraining order on the attenuated theory that the Government violated Goldring's constitutional rights under the Fourth and Fifth Amendments. As Respondents tell it, they have evidence that "conclusively establishes" that the Government "coerc[ed] Jefferies into serving as an arm of the Government for the purpose of unlawfully freezing the Goldring Accounts ... without any judicial, statutory, or other authority[.]" (Opp'n at 30–31.) On that premise, Respondents suggests the Court should apply something akin to the exclusionary doctrine to bar the Government from restraining the subject assets as the "fruit of the poisonous tree." In response, the Government strongly contests

---

[11] Finally, Respondents' reliance on *Luan* here is misplaced. They hook onto a sentence fragment from the D.C. Circuit's decision to suggest that U.S. courts can only restrain "the suspected proceeds" of a foreign criminal offense. (Opp'n at 27 (citing *Luan*, 722 F.3d at 392)). Whatever the Circuit may have meant by that passing reference, Respondents' effort to treat it as an additional "traceability" requirement premised on U.S. forfeiture law simply reaches too far. After all, and as the Government points out, (*see* Reply at 11–12), *Luan* went on to affirm the district court's issuance of an *in personam* order restraining all property up to a specific value, without regard to its nexus to the criminal offenses. *Luan*, 722 F.3d at 390 ("[T]he district court restrained all assets owned or controlled by Luan (and his Hong Kong co-defendants) located in the United States up to $23.7 million, until the conclusion of the Hong Kong proceedings."). In other words, the Circuit certainly did not limit the permissible scope of a restraining order under Section 2467(d)(3) based on traceability to specific assets.

Respondents' accusation and contends, in any case, that their request to "immunize the subject assets from restraint" on this theory is without basis. The Court agrees with the Government.

For starters, consider the so-called "conclusive[]" evidence behind Respondents' theory. They point to a January 2025 email from Jefferies' counsel to Respondents' counsel, ostensibly relating to the possibility of unfreezing Goldring's accounts at Jefferies, which states that Jefferies was "waiting for clearance from the DOJ and SEC" to do so. (Opp'n at 23, 31 (citing ECF No. 5-9).) From this, Respondents extrapolate that Jefferies froze the accounts in the first place—or at least kept them frozen for some period—at the direction of the United States government. But as the Government highlights in response, Jefferies' counsel subsequently sent an email to Respondents' counsel disclaiming that theory—correcting any misunderstanding that "the United States government requested that Jefferies freeze Ms. Goldring's accounts" and confirming that this "is not what occurred." (Reply at 15–16 (citing *Goldring Waisbiot v. Jefferies, LLC*, No. 25-cv-3606-JSR (S.D.N.Y.), ECF No. 21-1).) In short, the evidence that Respondents proffer to show the Government's supposed directive falls far afield from the sort of smoking-gun-evidence that they portrayed it to be. Thus, whatever rationale might have motivated Jefferies to freeze Goldring's accounts—and that issue is decidedly not before this Court, especially since Jefferies is not a party to these proceedings and is actively defending against Goldring's lawsuit in the Southern District of New York challenging those actions—Respondents have failed to show that the Government was behind that decision, whether directly, indirectly, or otherwise. And because Respondents must demonstrate governmental action to support their claimed constitutional violations, their final defensive theory falters at the starting line.

Moreover, even assuming *arguendo* that Goldring could establish a constitutional violation in connection with Jefferies' actions in freezing her accounts, the Court disagrees that such a

finding would not necessarily preclude the restraining order that the Government seeks. For one thing, the improper seizure of property does not automatically bar forfeiture of that the property. *See, e.g.*, *United States v. Six Hundred Thirty-Nine Thousand Five Hundred & Fifty-Eight Dollars ($639,558) In U.S. Currency*, 955 F.2d 712, 715 n.5 (D.C. Cir. 1992) ("[T]he fact that the defendant property had been seized after an illegal search does not 'immunize' it from forfeiture, any more than a defendant illegally arrested is immunized from prosecution."); *see also United States v. Cosme*, 796 F.3d 226, 236 (2d Cir. 2015) ("It is settled law that even when the initial seizure is found to be illegal, the seized property can still be forfeited.") (cleaned up). For another thing, the exclusionary rule is a remedy available "*in a criminal proceeding* against the victim of the illegal search and seizure," and thus "confined to situations where the Government seeks to use such evidence at trial to incriminate the victim of the unlawful search." *United States v. Patel*, 2024 WL 1932871, at *4 (D.D.C. May 1, 2024) (emphasis in original) (citations and quotations omitted). This is not such a circumstance. And Respondents certainly do not cite to any caselaw that has imposed—or even considered—taking such a step in this sort of posture.

Simply put, Respondents' insistence that the Court should decline to enforce the Uruguayan restraining orders on this basis fails.

## CONCLUSION AND RECOMMENDATION

Because the Government has satisfied all the core criteria for relief under 28 U.S.C. § 2467(d)(3)(A), and because Respondents' other arguments against the issuance of the requested restraining order are without basis, the undersigned **RECOMMENDS** that the Court **GRANT** the United States' application and enter the requested restraining order.

Dated: October 6, 2025

_____
MATTHEW J. SHARBAUGH
United States Magistrate Judge

\*     \*     \*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCvR 72.3(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).